**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ROME DIVISION**

| | | |
|---|---|---|
| **IN RE:** | ) | **CHAPTER 11** |
| | ) | |
| **BROWN INDUSTRIES, INC.,** | ) | **CASE NO. 21-41010** |
| | ) | |
| **Debtor.** | ) | |

**DEBTOR'S MOTION FOR (I) AUTHORITY TO (A) SELL CERTAIN REAL
PROPERTY FREE AND CLEAR OF LIENS, CLAIMS, AND ENCUMBRANCES (B)
TERMINATE REAL PROPERTY LEASE, AND (C)  ENTER INTO OCCUPANCY
AGREEMENT, AND (II) ENTRY OF AN ORDER (X) LIMITING NOTICE, (Y)
SETTING DEADLINE FOR COMPETING BIDS AND OBJECTIONS,
<u>AND (Z) SCHEDULING HEARING</u>**

COMES NOW Brown Industries, Inc., debtor and debtor-in-possession (the "**Debtor**") in the

above-styled case (the "**Case**"), by and through the undersigned counsel, and files this motion (the

"**Motion**") pursuant to Sections 105(a), 363(b), (f) and (m), and 365 of the Bankruptcy Code, and

Bankruptcy Rules 6004, 6006, 9006 and 9007 seeking the following relief:

(a)      Entry of an order (the "**Sale Order**")  authorizing the Debtor to (i) sell the Debtor's

interest in certain real property, including any buildings, fixtures or other improvements thereon,

located in Whitfield County, Georgia (the "**Property**"), as more fully described in that certain

Agreement for Sale and Purchase of Real Property, as amended by the First Amendment to

Commercial Purchase and Sale Agreement, attached hereto as <u>Exhibits A & B</u>, respectively

(collectively, the "**Agreement**"), to Cahutta Property Investments, LLC (the "**Buyer**") pursuant, to

the terms and conditions set forth in the Agreement, (ii) terminate that certain Lease Agreement

between the Debtor and Brown Corporation, dated December 21, 2020 (the "**Lease**"), (iii) enter that

certain temporary occupancy agreement with the Buyer (the "**Temporary Occupancy

Agreement**"), as more fully described in the Agreement; and

(b)      Entry of a scheduling order (the "**Scheduling Order**"), (i) limiting notice of this

Motion, (ii) setting deadlines for the filing of objections to this Motion or to submit a competing bid

for the Debtor's interest in the Property, and (iii) scheduling a hearing on this Motion (the "**Sale**

**Hearing**"), which would include holding an auction (the "**Auction**") if a higher and better offer is

submitted for the Debtor's interest in the Property as of the bid deadline.

In support of this Motion, the Debtor respectfully avers as follows:

## Introduction

1.       On August 20, 2021, (the "**Petition Date**"), the Debtor filed a voluntary petition for

relief under Subchapter V of  Chapter 11 of Title 11 of the United States Code (the "**Bankruptcy**

**Code**").  The Debtor is authorized to operate its business as a debtor-in-possession pursuant to

Section 1184 of the Bankruptcy Code.

2.       Pursuant to Section 1183 of the Bankruptcy Code, Gary Murphey has been

appointed as the Subchapter V Trustee in this Case (the "**Sub-V Trustee**").

## Jurisdiction And Venue

3.       This Court has jurisdiction of this Motion pursuant to 28 U.S.C. Sections 157 and

1334.  This is a core proceeding pursuant to 28 U.S.C. Sections 157(b)(2)(A), (N) and (O).  Venue

of the Debtor's Chapter 11 case and this Motion in this District is proper pursuant to 28 U.S.C.

Sections 1408 and 1409.  The statutory predicates for the relief sought herein are Sections 105(a),

363 and 365 of the Bankruptcy Code and Bankruptcy Rules 2002, 6004, 6006, 9006 and 9007.

## Background And Circumstances
## Leading Up To Chapter 11 Filing

4.       The Debtor began in the 1950s as the first flooring sample business to serve the

carpet industry.  Over the years it grew and expanded into other areas such as printing and product

displays, eventually becoming a global "point of purchase" business with more than 1 million

square feet of manufacturing space.  The Debtor currently employs approximately 294 employees

and has three separate divisions:  a sample division, a printing division and a display division.  In recent years, the Debtor has experienced cash flow issues which it was able to address in part through loans and advances made to the Debtor by the Brown family and one or more other shareholders.  Problems arising primarily as a result of the onset of COVID pandemic in 2020 exacerbated the Debtor's cash flow issues.

5.      During the period of time leading up to the Petition Date, the Debtor's financial condition had deteriorated such that it was unable to satisfy all of its financial obligations.  The Debtor anticipated closing on a transaction in the summer of 2021 which would provide for infusion of new capital sufficient to continue operations; however, in late July 2021, it became apparent that this transaction was not viable.   The lack of liquidity and working capital, which conditions were projected to worsen later in 2021, limited the Debtor's ability to operate its businesses.  Eventually, these cash flow issues forced the Debtor to make the difficult decision to lay off a number of its employees and mothball its printing business.  Shortly thereafter, the Debtor, in consultation with its advisors, decided to seek relief under Chapter 11 of the Bankruptcy Code in order to preserve and enhance the value of its business and assets for its employees, customers, vendors and other stakeholders.  Additional information about the Debtor's business and the events leading up to the Petition Date can be found in the Declaration of J. Darren Wilcox in Support of First Day Applications and Motions (the "**Wilcox Declaration**") which is incorporated herein by reference.

6.      The Debtor has determined, with the guidance and advice of its professional advisors, that the best and most efficient exit strategy for its successful emergence from Chapter 11 includes a sale of substantially all of its assets to one or more purchasers.

## The Property and the Proposed Transaction

7.      The Debtor and the Brown Corporation (collectively, the "**Sellers**"), each own a portion of the Property, which the Debtor uses primarily in connection with its print business. The Debtor owns approximately 68.6% of the Property; Brown Corporation owns approximately 31.4% of the Property.  Currently, the Debtor leases Brown Corporation's portion of the Property pursuant to the Lease.

8.      The Sellers have collectively agreed to sell the Property to the Buyer for the gross purchase price of Five Million Dollars ($5,000,000.00) (the "**Purchase Price**").  The Sellers have agreed to allocate the Purchase Price as follows: (a) Three Million, Four Hundred Sixty-One Thousand, Three Hundred Twenty-Two Dollars ($3,461,322.00) to the Debtor, which is approximately 69.23 %  of the Purchase, and (b) One Million Five Hundred Thirty Eight Thousand Six Hundred Seventy-Eight Dollars ($1,538,678.00) to Brown Corporation, which is approximately 30.77 % of the Purchase Price.  (The additional allocation of the Purchase Price to the Debtor is because the Debtor's portion of the Property contained certain office space, which is deemed to be more valuable than the warehouse space.)

9.      In connection with the sale, the Debtor and Brown Corporation have agreed to terminate the Lease as of the date of the Closing (as defined in the Agreement), with no material obligations of either party under the Lease following its termination.

10.     In addition, the Debtor has agreed to enter into the Temporary Occupancy Agreement with the Buyer, which will allow the Debtor to continue occupying the Property for a period of time (estimated at up to 120) days at a cost of $11,900 per month so that the purchaser of certain personal property will have had a reasonable opportunity to remove such personal property from the Property.

## Relief Requested

11.     By this Motion, the Debtor seeks the entry of the Sale Order approving the above-referenced transactions, including the sale of the Debtor's portion of the Property to the Buyer at the Purchase Price (or, if an Auction is held, to the winning bidder at the Auction at the highest and best price offered at the Auction), free and clear of all liens, claims and interests, the termination of the Lease, and the entry into the Temporary Occupancy Agreement.  The Debtor also requests that the Court designate the Buyer (or the winning bidder at the Auction) as a "good-faith purchaser" under Section 363(m) of the Bankruptcy Code and waive the 14-day stay otherwise required under Bankruptcy Rule 6004(h) in order to allow the Debtor and the Buyer to close on the proposed sale as soon as reasonably practicable.

12.     By the Motion, the Debtor also seeks the entry of the Scheduling Order, limiting notice of this Motion, setting deadlines for the filing of objections to this Motion or to submit a competing bid for the Debtor's interest in the Property, and scheduling the Sale Hearing including, if necessary, the Auction if a higher and better offer is submitted for the Debtor's interest in the Property as of the bid deadline.

## Basis for Relief Requested

### (a)     The Court Should Approve the Sale of the Debtor's Interest in the Property

13.     Section 363(b) of the Bankruptcy Code provides that a trustee (or debtor-in-possession) "after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b). Under the prevailing case law, a sale under Section 363(b) requires that the Court "expressly find from the evidence presented…. a good business reason" to approve the sale. *Comm. of Equity Sec. Holders v. Lionel Corp (In re Lionel Corp.)*, 722 F.3d 1063, 1071 (2d Cir. 1983). *Accord Stephens Indus., Inc. v. McClung*, 789 F.2d 386,

389-90 (6th Cir. 1986); *In Diplomat Constr.*, 481 B.R. 215, 218-19 (Bankr. N.D. Ga. 2012).

14.     The Trustee submits that a good business reason exists for the sale of its interest in the Property and that the approval of the sale is proper under the standard articulated under *Lionel*. As noted above, the Debtor, with the assistance of its professionals, has determined in its business judgment that it must liquidate its assets, including its interest in the Property. To this end, the Debtor, together with Brown Corporation, has marketed the Property to prospective buyers and believes that the Purchase Price offered by the Buyer represents the highest and best price that can reasonably be obtained for the Property, and that the allocation of the Purchase Price is fair and equitable. However, in the event that another prospective purchaser of the Property submits a higher bid for the Debtor's interest in the Property by the bid deadline, the Debtor would request that the Court hold an Auction for the Debtor's interest in the Property at the Sale Hearing and approve the sale of the Debtor's interest in the Property to the highest and best offer made at the Auction.

15.     The Debtor seeks to sell its interest in the Property free and clear of any claims, liens or interests. Section 363(f) of the Bankruptcy Code provides, in pertinent part as follows:

> (f)     The trustee may sell property under subsection (b) or (c) of this section free and clear of any interest in such property of an entity other than the estate, only if –
>
> (2) such entity consents;
>
> (3)  such interest is a lien and price at which such property is to be sold is greater than the aggregate value of all liens on such property;  . . . or
>
> *        *        *
>
> (5) such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.

11 U.S.C. § 363(f)(2), (5).

16.     The Debtor is not aware of any creditor that currently asserts a security interest in the

Property. However, if and to extent any security interests in the Property may exist, the holders of any such interest would have their interests adequately protected because any such security interests would either be satisfied at the Closing or would attach to the proceeds of the sale of the Property in the same priority as they currently exist on the Property.  Any accrued and unpaid ad valorem tax obligation owed on the Property would be paid at closing.  Moreover, to the extent that any creditors may assert valid liens on the Property, the Debtor believes such creditors would consent to the transaction and that the Purchase Price far exceeds the aggregate value of any such liens. Further, the Debtor submits that any creditor asserting an interest in the Property could be compelled to accept a money satisfaction of such interest in accordance with Section 363(f)(5) of the Bankruptcy Code.

       **(b)**     **The Court Should Approve the Termination of the Lease and the Entry by the Debtor into the Temporary Occupancy Agreement**

17.     The Court should authorize the Debtor to terminate the Lease under Section 105(a) of the Bankruptcy Code, which authorizes the Court to "issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title."  11 U.S.C. § 105(a).   The termination of the Lease is appropriate because the non-Debtor party to the Lease (i.e. Brown Corporation) is also selling its interest in the Property and has consented to the termination of the Lease with no material obligation of the Debtor remaining following such termination.

18.     The Court should permit the Debtor to enter into the Temporary Occupancy Agreement under Section 363(b) of the Bankruptcy Code because that will give the purchaser of certain of the Debtor's personal property a reasonable opportunity to remove such personal property from the Property, which was a condition of the sale of the personal property and integral in the Debtor realizing the highest price for such personal property.

**(c)      The Court Should Designate the Buyer as a "Good-Faith Purchaser" and Waive the 14-Day Stay**

19.      The Debtor requests that the Court designate the Buyer (or any successful bidder at the Auction) as a good faith purchaser, as such term is utilized in Section 363(m) of the Bankruptcy Code.  Such designation can be made by a Bankruptcy Court in the context of a sale of assets of a debtor when it has been established that the proposed purchaser is an unrelated third party, not affiliated with or having any insider relationship with the Debtor, and when the proposed transaction is for fair value and is the result of arms length negotiations between the parties.  *See In re Abbotts Dairies of Pennsylvania, Inc.*, 788 F.2d 143 (3d Cir. 1986).

20.      The Buyer meets the qualifications for designation as a good-faith purchaser in that: (a) it is not affiliated in any way with the Debtor,  (b) it has negotiated in good faith and at arm's length with the Debtor's management, and (c) the Purchase Price (and the Debtor's allocation thereof) is for fair value.  Similarly, any winning bidder at the Auction will presumably also meet the qualification for designation as a good-faith purchaser.

21 .      Bankruptcy Rules 6004(h) provides that an order authorizing the use, sale, or lease of property will be stayed for fourteen days after entry of such approval orders unless the court orders otherwise.   In order to permit the Buyer to close on the transaction as expeditiously as possible, the Debtor requests that the Court waive this requirement with respect to the Sale Order.

**(d)      The Court Should Enter the Scheduling Order**

22.      By the Motion, the Debtor also seeks the entry of the Scheduling Order, shortening and limiting notice of this Motion, setting deadlines for the filing of objections to this Motion or to submit a competing bid for the Debtor's interest in the Property, and scheduling the Sale Hearing including, if necessary, the Auction if a higher and better offer is submitted for the Debtor's

interest in the Property as of the bid deadline.  The Debtor will promptly serve a copy of the

Scheduling Order on (i) the Office of the United States Trustee, (ii) the Sub-V Trustee, (iii) the

Buyer, (iv) Brown Corporation, and (v) all parties identified on the Master Service List maintained

in this case.

23.     In the Scheduling Order, the Debtor requests that (a) the Sale Hearing (including the

Auction if necessary) be scheduled for November 18, 2021, (b) the deadline to object to the Motion

or to submit competing bids for the Property be set on November 15, 2021.

24.     Federal Rule of Bankruptcy Procedure 6004 provides, in pertinent part, as follows:

> (a)  Notice of Proposed Use, Sale, or Lease of Property.  Notice of a
> proposed use, sale, or lease of property, other than cash collateral, not in
> the ordinary course of business shall be given pursuant to Rule 2002(a)(2),
> (c)(1), (i), and (k) . . . .

Fed.R.Bankr.P. 6004.

25.     Federal Rule of Bankruptcy Procedure 9007 provides, in pertinent part, as follows:

> When notice is to be given under these rules, the court shall designate, if
> not otherwise specified herein, the time within which, the entities to whom,
> and the form and manner in which the notice shall be given.

Fed.R.Bankr.P. 9007.

26.     The Debtor contends that the forms of Scheduling Order proposed above and the

period for scheduling the Sale Hearing on the sale comport with Bankruptcy Rules 6004, 9007,

constitute good and sufficient notice of the relief sought herein, and of all hearings and procedures

contemplated hereby.

## **Miscellaneous Provisions**

27.     The Debtor seeks authorization to take such action and to execute and deliver any

approved asset purchase agreement and such other documents, agreements and instruments as may

be necessary or advisable to effectuate the transactions contemplated herein or otherwise approved

by the Court at the Sale Hearing, provided that the Debtor may not agree to any material

modification to an approved asset purchase agreement or ancillary documents without a further

Order of the Court.

 WHEREFORE, the Debtor respectfully requests that the Court grant the relief requested in

this Motion and such other and further relief as may be just and proper.

 This 22nd day of October, 2021.

Respectfully submitted,

SCROGGINS & WILLIAMSON, P.C.

4401 Northside Parkway
Suite 450
Atlanta, GA  30327
T:  (404) 893-3880
F:  (404) 893-3886
E:  rwilliamson@swlawfirm.com
 aray@swlawfirm.com

    /s/ Ashley R. Ray
    J. ROBERT WILLIAMSON
    Georgia Bar No. 765214
    ASHLEY REYNOLDS RAY
    Georgia Bar No. 601559

    *Counsel for the Debtor*

# **EXHIBIT 1**

**Agreement for Sale and Purchase of Real Property**

# AGREEMENT FOR SALE AND PURCHASE
# OF REAL PROPERTY

**This Agreement for the Sale and Purchase of Real Property** (this "Agreement") dated as of the Effective Date (as defined in Section 14.19 below) by and between **Brown Corporation**, a Georgia corporation and **Brown Industries, Inc.,** a Georgia corporation (collectively called "Seller") and **Cohutta Property Investments, LLC**, a Georgia limited liability company (hereinafter called "Purchaser").

## W I T N E S S E T H:

**WHEREAS,** Seller is the owner of certain real property, which real property, together with the improvements located thereon, all easements, appurtenances, hereditaments and rights appurtenant thereto or otherwise arising in connection therewith; and

**WHEREAS,** Purchaser desires to purchase, and Seller to sell, the Property, in accordance with the terms and conditions hereinafter set forth;

**NOW, THEREFORE,** for and in consideration of the above-recited premises, the mutual covenants and agreements hereinafter set forth, the sum of Ten and No/100 Dollars ($10.00) and other good and valuable consideration, the receipt, adequacy and sufficiency of which are hereby acknowledged, the parties hereto do hereby covenant and agree as follows:

1.    **Purchase and Sale.** Seller shall sell and convey to Purchaser, and Purchaser shall purchase from Seller, upon the terms and conditions hereinafter set forth the following:

1.1    that certain tract or parcel of land and being more particularly described on Exhibit "A" attached hereto and made a part hereof, together with all and singular the rights and appurtenances pertaining to such property, including any right, title and interest of Seller in and to adjacent streets, alleys or rights-of-way (the "Land");

1.2    the buildings and other **improvements on the Land (the "Improvements")**;

1.3    the personal property owned by Seller upon the Land or within the Improvements, including specifically, without limitation, heating, ventilation and air conditioning systems and equipment, appliances, furniture, carpeting, draperies and curtains, tools and supplies, and other items of personal property (excluding cash) used in connection with the operation of the Land and the Improvements (the "Personal Property");

1.4    **all of Seller's right, title and interest in** the Lease (as hereinafter defined);

1.5    **all of Seller's right, title and interest in and to: (A) all assignable contracts and agreements** relating to the upkeep, repair, maintenance or operation of the Land, Improvements or Personal Property which will extend beyond the date of Closing (as such term is defined in Section 8.1 hereof), including specifically, without limitation, all assignable equipment leases; and (B) all assignable warranties and guaranties (express or implied) issued to Seller in connection with the Improvements or the Personal Property (the property described in this Section 1.5 being sometimes herein referred to collectively as the "Intangibles"); and

1.6    a **perpetual waterline easement ("Waterline Easement"), to be located prior to the Closing** upon the Survey (as defined below), to be **located in the approximate location as shown in Exhibit "B," and**

shall be granted for the purpose of the installation and maintenance of a waterline to serve the Improvements.

1.7     The Land, the Improvements, the Personal Property, the Lease and the Intangibles are hereinafter sometimes referred to collectively as the "Property."

## 2.   Consideration.

2.1     *Purchase Price and Earnest Money*. The total purchase price ("Purchase Price") for the Property shall be $5,000,000.00, which shall be paid by Purchaser, as follows:

(A)     Within one (1) Business Day after the Effective Date, Purchaser shall deliver to The Minor Firm ("Escrow Agent") a deposit ("Earnest Money") of $50,000.00 by wire transfer of immediately available funds ("Good Funds") pursuant to wiring instructions delivered by Escrow Agent to Purchaser. The Earnest Money shall be held and disbursed in accordance with the escrow provisions set forth in Section 2.2 below.

(B)     In any event, if Purchaser is entitled to have the Earnest Money returned to Purchaser pursuant to any provision of this Agreement, then One Hundred Dollars ($100.00) of the Earnest Money shall nevertheless be paid to Seller as good and sufficient consideration for entering into this Agreement. In addition, Seller acknowledges that Purchaser, in evaluating the Property and performing its due diligence investigation of the Property, will devote internal resources and incur expenses, and that such efforts and expenses of Purchaser also constitute good, valuable and sufficient consideration for this Agreement.

(C)     The balance of the Purchase Price for the Property along with any expenses to be paid by Purchaser hereunder shall be paid to and received by Escrow Agent in Good Funds pursuant to wiring instructions provided by Escrow Agent no later than 11:00 a.m. (in the time zone in which Escrow Agent is located) on the Closing Date.

2.2     *Escrow Provisions Regarding Earnest Money*.

(A)     Escrow Agent shall hold the Earnest Money and make delivery of the Earnest Money to the party entitled thereto under the terms of this Agreement. Escrow Agent shall deposit the Earnest Money in Escrow Agent's IOLTA trust account at Truist Bank. Purchaser and Seller acknowledge that Escrow Agent's IOLTA trust account is a non-interest bearing account, and Escrow Agent shall have no responsibility for the payment of any interest on the Earnest Money. Escrow Agent shall have the right to commingle the Earnest Money with other funds held by Escrow Agent in such IOLTA trust account.

(B)     Escrow Agent shall hold the Earnest Money until the earlier occurrence of: (i) Closing Date, at which time the Earnest Money shall be applied against the Purchase Price and payment of expenses of Purchaser hereunder, or (ii) the date on which Escrow Agent shall be authorized to disburse the Earnest Money as set forth in subparagraph (C) below, or (iii) Purchaser's termination of the Agreement as provided in Section 5.1 or Section 6 herein, at which time the Earnest Money shall be returned to Purchaser in accordance with the terms thereof.

(C)     If the Earnest Money has not been released earlier in accordance with subparagraph (B) above, and either party makes a written demand upon Escrow Agent for payment of the Earnest Money, Escrow Agent shall give written notice to the other party of such demand. If Escrow Agent does not receive a written objection from the other party to the proposed payment

within three (3) Business Days after the giving of such notice, Escrow Agent is hereby authorized to make such payment. If Escrow Agent does receive such written objection within such 3-Business Day period, Escrow Agent shall continue to hold such amount until otherwise directed by **written instructions from both parties to this Agreement or a final judgment or arbitrator's decision.** However, Escrow Agent shall have the right at any time to deposit or interplead the Earnest Money and interest thereon, if any, with a court of competent jurisdiction in the county in which the Property is located. Escrow Agent shall give written notice of such deposit to Seller and Purchaser. Upon such deposit, Escrow Agent shall be relieved and discharged of all further obligations and responsibilities hereunder.

(D)     The parties acknowledge that Escrow Agent is acting solely as a stakeholder at their request and for their convenience, and that Escrow Agent shall not be deemed to be the agent of either of the parties and shall not be liable for any act or omission on its part unless taken or suffered in bad faith in willful disregard of this Agreement or involving gross negligence or willful misconduct. Seller and Purchaser jointly and severally shall indemnify and hold Escrow Agent **harmless from and against all costs, claims and expenses, including reasonable attorney's fees, incurred in connection with the performance of Escrow Agent's duties hereunder, except with** respect to actions or omissions taken or suffered by Escrow Agent in bad faith, in willful disregard of this Agreement or involving gross negligence or willful misconduct on the part of the Escrow Agent. The indemnification obligations of a particular party hereunder shall only be triggered by the acts or omissions of that party. Seller shall not be obligated to indemnify Escrow Agent for acts or omissions of Purchaser and Purchaser shall not be obligated to indemnify Escrow Agent for the acts or omissions of Seller. The parties agree that if the Escrow Agent is an affiliated subsidiary of the law firm representing a party, and that such law firm may continue to represent such party in this transaction and in any dispute and/or litigation arising from or related to this Agreement.

(E)     The parties shall deliver to Escrow Agent an executed copy of this Agreement, which shall constitute the sole instructions to Escrow Agent. Escrow Agent shall execute the signature page for Escrow Agent attached hereto with respect to the provisions of this Section 2.2; **provided, however, that: (i) Escrow Agent's signature hereon shall not be a prerequisite to the** binding nature of this Agreement on Purchaser and Seller, and this Agreement shall become fully effective upon execution by Purchaser and Seller, and (ii) the signature of Escrow Agent will not be necessary to amend any provision of this Agreement other than this Section 2.2.

(F)     Escrow Agent, as the person responsible for closing the transaction within the meaning of Section 6045(e)(2)(A) of the Internal Revenue Code of 1986, as amended ("Code"), shall file all necessary information, reports, returns, and statements regarding the transaction required by the Code including, but not limited to, the tax reports required pursuant to Section 6045 of the Code. The provisions of this Section 2.2 shall survive Closing or termination of this Agreement.

2.3     *Price Allocation.* The parties agree that the purchase price shall be allocated as follows: (A) 31.4% or $1,570,000.00 to Brown Corporation; and (B) 68.6% or $3,430,000.00 to Brown Industries, Inc.

**3.     Documents and Records to be Furnished by Seller.** No later than five (5) Business Days after the Effective Date, Seller will deliver to Purchaser Property information and reports, including, without limitation, surveys, title reports, grading plans, environmental studies, zoning documents, soil reports, and **any other information in Seller's possession concerning the Property.**

4.    **Title and Survey.**

4.1    *Title Commitment and ALTA/NSPS Survey.* Within 40 days of the Effective Date (the "Inspection Period"), Purchaser shall obtain, at its sole cost and expense, a title insurance commitment ("Commitment") issued by a title insurance company selected by Purchaser and reasonably acceptable to Seller ("Title Company") covering the Property. Purchaser shall have the right during the Inspection Period to obtain a survey (the "Survey") of the Property, dated subsequent to the date hereof, prepared by a licensed surveyor or Registered Professional Engineer in accordance with ALTA/NSPS standards. If obtained, a copy of the Survey shall also be furnished to the Title Company by Purchaser prior to the end of the Inspection Period. If the legal description on the Survey differs from the description set forth on Exhibit "A," then the legal description from the Survey, once approved by both Seller and Purchaser, shall be incorporated herein for all purposes.

4.2    *Permitted Encumbrances.* Unless the Purchaser terminates this Agreement pursuant to the provisions of Section 5 below, the Property will be conveyed at the Closing subject to the matters listed in Schedule B-2 of the Commitment which shall be deemed permitted exceptions (the "Permitted Exceptions"). Notwithstanding any other provisions in this Section 4.2, Purchaser need not disapprove any title matters representing monies owed, such as a notice of default, lien, assessment, mortgage, deed of trust or bond, and Seller shall at its cost cause those items (except non-delinquent taxes and assessments) to be eliminated before the Closing, and if Seller does not do so before the Closing, then Escrow Agent shall cause them to be eliminated at the Closing using Purchase Price proceeds.

5.    **Inspection Period.**

5.1    *Inspection.* Purchaser shall have the right during the Inspection Period to make a physical inspection of the Property and to examine all books and records maintained by Seller relating to the Property at such place or places as said books and records may be located; provided, however, any such inspections shall be conducted in the presence of Seller or its representative. Purchaser has the exclusive right to terminate this Agreement at any time during the Inspection Period for any reason. If Purchaser elects to terminate this Agreement pursuant to this Section, it shall give written notice of such termination to Seller and to Escrow Agent prior to 5:00 p.m. Dalton, Georgia time of the last day of the Inspection Period ("Notice of Termination"). Upon receipt by Seller and Escrow Agent within the Inspection Period of such Notice of Termination from Purchaser, then within five (5) days of such receipt Escrow Agent shall return the Earnest Money to Purchaser and this Agreement shall be of no further force or effect. Purchaser may, after the expiration of the Inspection Period and before closing, re-examine the status title, survey and environmental to the Property to determine if there have been any material changes since the expiration of the Inspection Period. In the event of any material changes which adversely affect the Property, Purchaser may terminate this Agreement and receive a full refund of the Earnest Money.

5.2    *Access to Property.* Purchaser, its agents, employees and representatives shall have access to the Property, upon 24 hours prior notice to Seller, at all reasonable times subsequent to the Effective Date during the Inspection Period to inspect the Property and to conduct reasonable investigations, studies and tests thereon as Purchaser, its counsel, licensed engineers, surveyors or other representative may deem reasonably necessary. Any tests, examinations or inspections of the Property by Purchaser and all costs and expenses in connection with Purchaser's inspection of the Property shall be at the sole cost of Purchaser and shall be performed in a manner not to unreasonably interfere with the Seller's ownership of the Property. Further, Purchaser shall be responsible for any and all damage caused by such inspections, examinations, testing and disposal of all wastes produced at the Property as a result of such investigations, and shall sign, as generator, all forms necessary for such disposal. Purchaser shall immediately remove any lien of any type which attaches to the Property by virtue of any of such inspections, examination or test. Upon completion of any such inspection, examination or test Purchaser shall restore any damage to the

Property caused by such inspection, examination or test. Purchaser hereby indemnifies, defends and holds Seller harmless from and for all loss, liability, cost or expense (including, without limitation, mechanics' or materialmen's liens or claims of liens), actions and causes of action arising from or relating to Purchaser's (or Purchaser's authorized agents, consultants, engineers, employees, or representatives) entering upon the Property and performing such tests, studies, investigations or inspections of the Property, whether pursuant to this Section 5.2 or otherwise, including, but not limited to, Purchaser's failure to remove or bond any lien placed on the Property as a result of Purchaser's inspections.

6.    **Purchaser's Closing Contingencies.** Notwithstanding the foregoing, or anything to the contrary contained herein, Purchaser's obligation to purchase the Property under this Agreement is subject to: (a) there being no material breach of any of Seller's representations, warranties, covenants, duties or obligations in this Agreement as of the date of Closing; and (b) receipt by Purchaser at Closing of a contractual commitment by the Title Company to issue an Owner's Policy of Title Insurance issued pursuant to the Commitment subject only to the Permitted Exceptions and other exceptions as provided pursuant to this Agreement. If any or all of the above conditions are not satisfied at Closing, then Purchaser shall have a right to: (y) extend the Closing as necessary in order to satisfy the aforementioned conditions, and/or (z) terminate this Agreement by written notice to Seller, in which event, this Agreement shall terminate and the Escrow Agent shall promptly deliver the Earnest Money to Purchaser and the parties shall be relieved of liability to each other under this Agreement except as otherwise specifically set forth in this Agreement.

7.    **Contingent on Approval of Bankruptcy Court**. This Agreement and all obligations of the parties set forth herein, are contingent upon the approval of the sale of the interest of Brown Industries, Inc. by the United States Bankruptcy Court for the Northern District of Georgia, in that certain Chapter 11 filing in Case No. 21-41010.

8.    **Closing.**

8.1    *Closing Date.*  The parties acknowledge and agree that the closing of the transaction contemplated herein **(the "Closing")** will take place on or before 10 calendar days following the expiration of the Inspection Period (as hereinafter defined), or the next following Business Day if appropriate (the **"Closing Date"), in escrow, through the Escrow Agent such that the Seller will receive the Purchase Price** on the day of Closing upon the delivery of the documents set forth in this Agreement.

8.2    *Seller Closing Deliveries.* On or before the Closing Date, Seller shall deliver to Escrow Agent, each of the following items, executed as appropriate by Seller, to be held in escrow pending written confirmation by Seller that all conditions to the obligation of Seller to close on the sale of the Property have been satisfied:

(A)    A Limited Warranty Deed, in recordable form, duly executed by Seller and conveying to Purchaser fee simple title to the Property, subject only to the Permitted Exceptions (the "Deed").

(B)    A Bill of Sale and Assignment (the "Bill of Sale") conveying all interest of the Seller to all personal property used in connection with the Property.

(C)    **A Seller's Affidavit in the form** as requested by Title Company and reasonably agreed to by Seller.

(D)    An affidavit of Georgia residency sufficient to enable the Title Company and **Purchaser not to withhold and submit to the Georgia Department of Revenue ("DOR") the portion**

of the transfer price under O.C.G.A. Section 48-7-128, or if the Seller is unable to provide such affidavit, an affidavit of gain in accordance with applicable DOR requirements (in such instance, the applicable percentage of gain under O.C.G.A. Section 48-7-128 and corresponding DOR regulations shall be submitted by the Title Company to DOR as required under applicable Law).

(E)     A FIRPTA Affidavit duly executed by Seller, stating that Seller is not a "foreign person" as defined in the federal Foreign Investment in Real Property Tax Act of 1980 and the 1984 Tax Reform Act, and in the event Seller is unable or unwilling to deliver the FIRPTA Affidavit, in lieu thereof the funds payable to Seller shall be adjusted in such a manner as to comply with the withholding provisions of such statutes.

(F)     A closing statement (the "Closing Statement") setting forth in reasonable detail the financial transaction contemplated by this Agreement, including without limitation the Purchase Price, all prorations, the allocation of costs specified herein, and the source, application and disbursement of all funds.

(G)     Reasonable documentation evidencing Seller's existence and authority as may be reasonably required by Title Company in order for Title Company to issue to Purchaser the Title Policy.

(H)     An Assignment of that certain lease dated December 21, 2020 by and between Brown Corporation, as landlord, and Brown Industries, Inc., as tenant, (the "Lease") a copy of which is attached hereto as Exhibit "B".

(I)     Such other documents as may be reasonably required by the Title Company necessary to consummate the sale of the Property, in forms reasonably acceptable to Seller.

8.3     *Purchaser Closing Deliveries.*  On or before the Closing Date, Purchaser shall deliver to Escrow Agent, each of the following items, to be held in escrow pending written confirmation by Purchaser that all conditions to the obligation of Purchaser to close on the sale of the Property have been satisfied:

(A)     The full Purchase Price (with credit for the Earnest Money), plus or minus the adjustments or prorations required by this Agreement.

(B)     The Closing Statement.

(C)     Reasonable documentation evidencing Purchaser's existence and authority as may be reasonably required by Title Company in order for Title Company to issue to Purchaser the Title Policy.

(D)     Such other documents as may be reasonably required by the Title Company necessary to consummate the sale of the Property, in forms reasonably acceptable to Purchaser.

8.4     *Closing Costs.*  Seller shall pay any transfer tax or documentary stamps on the Deed, one-half of escrow charges of Escrow Agent, if any, related to Closing, and its own attorneys' fees. Purchaser shall pay for the recordation costs associated with the Deed, all costs related to any loan obtained by Purchaser for this transaction (including without limitation premiums for any loan title policy and endorsements, loan fees, and any applicable intangibles tax and mortgage tax), all costs of the Survey, investigations, appraisals, and inspections incurred or performed by or on behalf of Purchaser, one-half of escrow charges of Escrow Agent, if any, related to Closing, and its own attorneys' fees. Purchaser shall

pay the costs for the title exam, the preparation of the Commitment, and all premiums for the Title Policy, including extended coverage and any endorsements thereto.

8.5    *Prorations.* Seller shall be solely responsible to pay all unpaid ad valorem property taxes respecting the Property for all years prior to the year in which Closing occurs. Any real estate ad valorem or similar taxes for the Property, rent or any assessments or installments of assessments due and payable in the calendar year of Closing, shall be prorated to the Closing Date. The proration of real property taxes or assessments shall be based upon the assessed valuation and tax rate figures (assuming payment at the earliest time to allow for the maximum possible discount) for the year in which the Closing occurs to the extent such amounts are available; provided, if the actual amounts (whether for the assessed value of the Property or for the tax rate) for the year of Closing are not available at the Closing Date, the proration shall be made using figures from the preceding year (assuming payment at the earliest time to allow for the maximum possible discount). The proration of real property taxes or installments of assessments shall be final and not subject to re-adjustment after Closing.

8.6    *Possession of the Property.* Seller shall deliver possession of the Property to Purchaser at the time of Closing.

9.    **Representations and Warranties.**

9.1    ***Seller's Representations and Warranties.***    Seller hereby makes the following representations, warranties and covenants:

(A)    Seller has the right, power and authority to enter into this Agreement and the right, power, and authority to convey the Property in accordance with the terms and conditions of this Agreement, and this Agreement constitutes the valid and binding agreement of Seller and is enforceable in accordance with its terms.

(B)    Seller is not a "foreign person" within the meaning of U.S. Code Sections 1445 and 7701 (i.e., Seller is not a nonresident alien, foreign corporation, foreign partnership, foreign trust or foreign estate as those terms are defined in the Code and regulations promulgated thereunder).

(C)    Neither Seller nor any person or entity that directly or indirectly owns any interest in Seller nor any of its officers, directors or managing members is a person or entity with whom U.S. persons or entities are restricted from doing business under regulations of the Office of Foreign Asset Control ("OFAC") of the U.S. Department of the Treasury (including those named on OFAC's Specially Designated and Blocked Persons List) or under any statute, executive order (including, but not limited to, Executive Order 13224 ("Executive Order") signed on September 24, 2001 and entitled "Blocking Property and Prohibiting Transactions with Persons Who Commit, Threaten to Commit, or Support Terrorism"), or other governmental action, and Seller's activities do not violate the International Money Laundering Abatement and Financial Anti-Terrorism Act of 2001 or the regulations or orders promulgated thereunder (as amended from time to time, the "Money Laundering Act").

(D)    Seller is the sole owner in fee simple of the Property.

(E)    The Property is not subject to any mortgage, pledge or lien, except liens for ad valorem taxes not yet payable and unperfected purchase money security interests existing in the ordinary course of business without the execution of a security agreement.

(F)    No consent of any Federal, State or local authority is required to be obtained by Seller in connection with the consummation by Seller of the transactions contemplated hereby.

(G)    Seller has received no notice of, nor is Seller aware of, any pending, threatened, or contemplated actions by any governmental authority or agency having the power of eminent domain, which might result in part of the Property being taken by condemnation or conveyed in lieu thereof.  Seller shall, promptly upon receiving any such notice or learning of any such contemplated or threatened action, give Purchaser written notice thereof.

(H)    No assessments have been made against any portion of the Property which are unpaid (except ad valorem taxes for the current year), whether or not they have become liens; and Seller shall notify Purchaser upon learning of any such assessments.

(I)    There is no litigation or proceeding pending, or to Seller's knowledge threatened, against or relating to or affecting all or any part of the Property, nor does Seller know or have reasonable grounds to know of any basis for any such action.

(J)    Other than the Lease, there is no tenant, lessee, or other occupant of the Property (including any improvements thereon) having any right or claim to possession or use of the Property (or any such improvements) after the Closing Date hereof, and possession of the Property shall be delivered by Seller to Purchaser at the Closing free of the rights or claims of any tenants, occupants, or other parties in possession of, or having or claiming any right to possession or use of the Property.

(K)    When the transactions contemplated hereby are consummated, the improvements on the Property will be in the same condition as they are on the date of the execution of this Agreement, except for:  ordinary wear and tear; any damage caused by an insured event for which full insurance proceeds have been paid to Purchaser; and any change in the condition of the improvements for which proper adjustment has been made between the parties hereto.

9.2    *Purchaser's Representations and Warranties.*  Purchaser hereby makes the following representations, warranties and covenants:

(A)    This Agreement has been duly authorized, executed and delivered by all necessary action on the part of Purchaser, and constitutes the valid and binding agreement of Purchaser and is enforceable in accordance with its terms.

10.    **Brokers.**  The parties each represent and warrant to the other that there are no real estate brokers, salesman or finders involved in this transaction other than Industry Real Estate Partners (the "Authorized Broker").  **The Seller hereby agrees that it shall pay a brokerage commission (the "Commission") to the** Authorized Broker pursuant to a separate agreement between Seller and the Authorized Broker.  If a claim is made by anyone other than the Authorized Broker for brokerage fees or commissions in connection with this transaction by any broker, salesman or finder claiming to have dealt by, through or on behalf of one of the parties hereto (the "**Indemnitor**"), Indemnitor shall **indemnify, defend and hold harmless the other party** hereunder (the "**Indemnitee**"), and **Indemnitee's officers, directors, agents and representatives, from and** against any and all liabilities, damages, claims, costs, fees, and expenses whatsoever, including reasonable **attorneys' fees and court costs through all trial and all appellate levels, with** respect to said claim for brokerage. The parties acknowledge and agree that any brokerage charge or commission for the Authorized Broker shall be the exclusive responsibility of Seller.

## 11.    Disclaimer and Release

11.1    *Disclaimer*.  Purchaser acknowledges and agrees that to the maximum extent permitted by law, THE SALE OF THE PROPERTY IS MADE ON AN "AS IS, WHERE IS" CONDITION AND BASIS WITH ALL FAULTS, KNOWN OR UNKNOWN, PATENT, LATENT, OR OTHERWISE.  Purchaser acknowledges and agrees that Seller has not made, does not make, and specifically negates and disclaims any representations, warranties, promises, covenants, agreements, or guaranties of any kind, character, or nature whatsoever, whether express or implied, oral or written, past, present, or future, of, as to, concerning or with respect to: (A) the value, nature, quality, or condition of the Property or any improvements thereon (including, without limitation, water, environmental, flora, fauna, soil, and geology); (B) the income to be derived from the Property; (C) the suitability of the Property and/or the improvements located thereon for any and all activities and uses which Purchaser may conduct thereon regardless of whether disclosed to Seller; (D) the compliance of or by the Property and/or the improvements located thereon or their operation with any laws, rules, ordinances, or regulations of any applicable governmental authority or body; (E) the habitability, merchantability, marketability, profitability, or fitness for a particular purpose of the Property and/or any improvements thereon; (F) the manner or quality of the construction or materials incorporated into the Property; (G) the manner, quality, state of repair or lack of repair of the Property or any improvements thereon; and (H) any other matter of any nature whatsoever with respect to the Property. Specifically, but not limited to the foregoing, Purchaser acknowledges and agrees that Seller has not made, does not make, and specifically disclaims any representations regarding compliance with any environmental protection, pollution, or land use laws, rules, regulations, orders, or requirements, including the existence in or on the Property of hazardous materials. Purchaser has not relied upon any representation or warranty made by Seller, any parent, subsidiary, or affiliate thereof, or any of its officers, directors, employees, agents or representatives in entering into this Agreement to purchase the Property. Purchaser further acknowledges and agrees that, having been given the opportunity to inspect the Property, Purchaser is relying solely on its own investigation of the Property and not on any information provided or to be provided by Seller, and at Closing Purchaser agrees to accept the Property and be deemed automatically to release and waive all objections or claims against Seller (including, but not limited to, any right to, or claim or, contribution) arising from or related to the Property, or to any hazardous materials in or on the Property. Purchaser further acknowledges and agrees that any information provided, or to be provided with respect to the Property, by Seller could have been obtained from a variety of sources and that Seller has not made any independent investigation or verification of such information and makes no representations as to the accuracy or completeness of such information.  Seller is not liable or bound in any manner by any verbal or written statements, representations, or information pertaining to the Property or the operation thereof, furnished by Seller, any real estate broker, agent, employee, servant, or other person.  It is understood and agreed that the Purchase Price has been established by prior negotiation to reflect that all of the Property is sold by Seller and purchased by Purchaser subject to the foregoing.  The provisions of this Section shall survive Closing or termination of this Agreement.

11.2    *Release*.  Purchaser, on behalf of itself and its heirs, successors, and assigns (the "releasing parties") hereby waives, releases, acquits, and forever discharges Seller, and its respective officers, directors, shareholders, employees, agents, attorneys, representatives, and every other person acting on behalf of Seller, and their respective successors and assigns, of and from any and all claims, actions, causes of action, demands, rights, damages, costs, expenses, or compensation whatsoever, direct or indirect, known or unknown, foreseen or unforeseen, which any of the releasing parties now has or which may arise in the future on account of or in any way related or pertaining to any past, present, or future physical characteristic or condition of the Property, or any improvements, including without limitation, any hazardous materials in, at, under or related to the Property or any violation or potential violation of any environmental requirement applicable thereto.  Notwithstanding anything to the contrary set forth herein, this release shall survive Closing or termination of this Agreement.

## 12.    Condemnation; Casualty.

12.1    *Condemnation.* Should the Property or any substantial or material portion thereof be taken by condemnation or conveyed under the threat of condemnation prior to Closing, Purchaser may: (A) terminate this Agreement by notifying Seller in writing within five (5) days after Purchaser receives notice thereof from Seller, in which case the Earnest Money shall be refunded to Purchaser promptly upon request, and all rights and obligations of the parties under this Agreement shall expire, except for those that survive the termination hereof, and this Agreement shall terminate; or (B) proceed to Closing, in which event the Purchase Price shall be reduced by the total of any awards or other proceeds received by Seller on or before the date of Closing with respect to any taking or conveyance, and, at Closing, Seller shall assign to Purchaser all of its right to the net amount of any and all awards or other proceeds paid or payable thereafter by reason of such taking or conveyance. Seller shall notify Purchaser of the existence of eminent domain proceedings within five (5) days after Seller actually learns thereof. If Purchaser fails to provide a timely notice to Seller under item (A) above, it shall be conclusively deemed to have elected to proceed under item (B) above. Except as otherwise set forth above, the condemnation of part, but not all, of the Property shall **not affect the parties' rights and obligations hereunder with respect to the portion** of the Property not condemned.

12.2    *Casualty Loss.* If, prior to the Closing Date, any substantial or material portion of the Property is damaged or destroyed by fire or other casualty, then Seller shall promptly upon acquiring actual knowledge thereof deliver written notice to Purchaser of such casualty and the following provisions shall apply with respect to such casualty:

(A)    if such damage or destruction results in a casualty loss which would exceed $100,000 to repair, as determined by Seller in the exercise of reasonable discretion ("Casualty Threshold"), either Purchaser or Seller shall have the right to terminate this Agreement by written notice to the other party hereto received within ten (10) days after such notice of fire or other casualty, in which event this Agreement shall terminate and thereafter neither party hereto shall have any further rights, obligations or liabilities hereunder except to the extent that any right, obligation or liability set forth herein expressly survives termination of this Agreement. If this Agreement is not terminated pursuant to this subparagraph (a), Seller and Purchaser shall be obligated to close the purchase and sale contemplated hereby.

(B)    if such damage or destruction results in a casualty loss in an amount not exceeding the Casualty Threshold, neither Purchaser nor Seller shall have such right to terminate this Agreement. At Closing, Seller shall assign to Purchaser all insurance proceeds payable under Seller's insurance policies on account of any such damage or destruction and credit to Purchaser all such insurance proceeds previously paid, together with an amount equal to the amount of any insurance deductible applicable to the casualty loss. Seller shall not be obligated to repair or restore the damage to such Property on account of such casualty.

## 13.    Default and Remedies.

13.1    *Purchaser's Default.* In the event of a Default by Purchaser under the terms of this Agreement, Escrow Agent shall disburse the Earnest Money to Seller, and Seller shall be entitled, as its sole and exclusive remedy hereunder, to retain the Earnest Money as full liquidated damages for such default of Purchaser, whereupon this Agreement shall terminate and the parties shall have no further rights or obligations hereunder, except for those which expressly survive any such termination. It is hereby agreed that Seller's damages in the event of a default by Purchaser hereunder are uncertain and difficult to ascertain, and that the Earnest Money constitutes a reasonable liquidation of such damages and is intended not as a penalty, but as full liquidated damages. Purchaser covenants not to bring any action or suit challenging the

amount of liquidated damages provided hereunder in the event of such default. Notwithstanding anything to the contrary contained herein, this provision shall in no way affect or impair Seller's right of recovery under any indemnity given by Purchaser in favor of Seller under this Agreement.

13.2    *Seller's Default.* In the event of a Default by Seller under the terms of this Agreement, Purchaser's sole and exclusive remedies hereunder shall be to either terminate this Agreement and receive a refund of the Earnest Money from Escrow Agent, or to seek specific performance of Seller's obligations under this Agreement, without any reduction in the Purchase Price, by commencing such an action within thirty (30) days after the date of Seller's default. Purchaser shall have no right to seek or recover damages of any nature whatsoever from Seller in the event of a default by Seller under the terms of this Agreement.

13.3    *Survival.* The provisions of this Article shall survive Closing or termination of this Agreement.

## 14.    Miscellaneous Provisions.

14.1    *Confidentiality.* Between the Effective Date and the Closing (or, if Closing should not occur for any reason, for a period of 2 years), neither party shall, without the prior written consent of the other party, directly or indirectly, disclose all or any portion of this Agreement, together with any other information pertaining thereto (collectively, the "Confidential Information") or the substance thereof to any third party except: (A) as may be required by applicable law or legal process; or (B) as may be disclosed to the parties directors, officers, employees, agents, attorneys and other representatives (each, a "Representative") on a "need to know" basis for purposes of evaluating, negotiating and documenting this Agreement and/or any current or proposed secured interests in the Property. Each party shall cause each Representative not to disclose Confidential Information and to treat, hold and maintain all Confidential Information in strictest confidence in accordance with the terms of this Agreement. Each party to this Agreement shall be responsible for maintaining the confidentiality of the Confidential Information and preventing the unauthorized disclosure thereof by a Representative. In the event that either party to this Agreement or any Representative becomes legally compelled to disclose any of the Confidential Information, then in such event that party will provide the other party with prior written notice of such disclosure so that the other party may seek a protective order or other appropriate remedy.

14.2    *Removal of Personal Property.* Any equipment removed from the Property must be disconnected from the first connection from the equipment and any other service feed remaining with the Improvements.

14.3    *Assignment; Successors in Interest.* Except as described below, Purchaser may not assign its interest in this Agreement to another party ("Assignee") without Seller's prior written consent, which consent may be withheld in Seller's sole discretion. Purchaser may assign its interest in this Agreement to an Assignee without Seller's prior written consent as long as such Assignee is Purchaser's wholly-owned (directly or indirectly) subsidiary or affiliate, which ownership status shall be represented by Purchaser in the Assignment and Assumption of Purchase and Sale Agreement (as defined below). Before any assignment hereunder is effective (whether to a subsidiary, affiliate, or other party), Purchaser and Assignee shall deliver to Seller an executed assignment and assumption document reasonably acceptable to Seller (the "Assignment and Assumption of Purchase and Sale Agreement"), in which Assignee shall give the same representations, warranties, and covenants as given by Purchaser in this Agreement. Upon such assignment, Purchaser shall not be released from liability under this Agreement. This Agreement shall inure to the benefit of and shall be binding upon the parties hereto and their respective heirs, legal representatives, successors and assigns. Except as expressly provided in this Agreement, nothing herein is intended to imply nor shall confer on any person other than the parties hereto, and their respective heirs,

legal representatives, successors or assigns, any rights, remedies, obligations or liabilities under or by reason of this Agreement, or constitute the parties hereto, partners or participants in a joint venture.

14.4    *Controlling Law.* This Agreement shall be governed by and construed in accordance with the domestic laws of the State of Georgia without giving effect to the principles of conflicts of law thereof. Each of the Parties consents to the exclusive jurisdiction of the Superior Court of Whitfield County, Georgia for any legal action, suit, or proceeding arising out of or in connection with this Agreement, and agree that any such action, suit, or proceeding may be brought only in such court. Each of the Parties further waives any personal jurisdiction defense regarding the laying of venue for any such suit, action, or proceeding in such court.

14.5    *Amendment; Waiver.* The terms of this Agreement may be amended, modified or eliminated, and the observance or performance of any term, covenant, condition or provision herein may be omitted or waived (either generally or in a particular instance and either prospectively or retroactively) only by the written consents of all parties hereto. No omission or waiver shall be deemed to excuse any future observance or performance or to constitute an amendment, modification or elimination unless it expressly so states. The waiver by any party hereto of a breach of any term or provision of this Agreement shall not be construed as a waiver of any subsequent breach.

14.6    *Severability.* Any term or provision of this Agreement which is invalid or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such invalidity or unenforceability without rendering invalid or unenforceable the remaining terms and provisions of this Agreement or affecting the validity or enforceability of any of the terms or provisions of this Agreement in any other jurisdiction.

14.7    *Further Assurances.* Each party agrees that it will without further consideration execute and deliver such other documents and take such other action, whether prior or subsequent to Closing, as may be reasonably requested by the other party to consummate more effectively the purposes or subject matter of this Agreement.

14.8    *Attorneys' Fees.* In the event of any controversy, claim or dispute between the parties affecting or relating to the subject matter or performance of this Agreement, the prevailing party shall be entitled to recover from the nonprevailing party all of its reasonable expenses, including reasonable **attorneys' and accountants' fees.**

14.9    *No Third Party Beneficiary.* The provisions of this Agreement and of the documents to be executed and delivered at Closing are and will be for the benefit of Seller and Purchaser only and are not for the benefit of any third party, and accordingly, no third party shall have the right to enforce the provisions of this Agreement or of the documents to be executed and delivered at Closing.

14.10    *Recording.* This Agreement shall not be recorded.

14.11    *Notices.* All notices, demands, consents, approvals, and other requests which may be given **or which are required to be given by either party to the other (each a "Notice") shall be in writing and may** be: (A) hand delivered, (B) delivered by way of overnight delivery service (such as Federal Express Corporation or United Parcel Service, or other nationally recognized overnight courier service with confirmation of delivery), or (C) transmitted via electronic mail provided that the sender must obtain a written confirmation of receipt by way of electronic confirmation showing the date and time of the transmission. In the event Notice is provided by electronic mail a copy of the Notice must also be delivered the next day by method (A) or (B) above. Notices cannot be given through the United States Postal Service or by mail under any means. All Notices shall be deemed effective either: (A) upon delivery if hand

delivered, as evidenced by written receipt therefor, whether or not actually received by the person to whom addressed; (B) on the day deposited into the custody of a nationally recognized overnight delivery service for overnight next day delivery, addressed to such party at the address indicated herein; or (C) the date of the receipt of a confirmation of electronic mail is received by the sender if a confirmation of receipt is received by the sender. Refusal to accept, or inability to deliver because of changed address of which no notice was given, shall be deemed receipt on the date of such refusal of delivery or inability to deliver. Either party may, from time to time, change the address to which Notices shall be sent by like Notice given to the other party hereto, except that no party may change its address to other than a street address. Any Notice given that does not conform to this paragraph shall be effective only upon receipt. Notices need not be provided to Escrow Agent unless such Notice requests action by Escrow Agent. The addresses for Notices given pursuant to this Agreement shall be as follows:

        If to Purchaser, to:

        1906 South Hamilton Street
        Dalton, GA 30720
        tboggs@textilemanagement.com

        If to Seller, to:

        203 W Industrial BLVD
        Dalton, GA 30720
        Bryan.mcallister@brownind.com

        P.O. Box 1103
        Dalton, Georgia 30722-1103
        darren.wilcox@brownind.com

      14.12   *Time of the Essence.* Time is of the essence of each and every provision of this Agreement.

      14.13   *Captions.* The sections and other headings contained in this Agreement are for reference purposes only and shall not be deemed to be part of this Agreement, or to affect the meaning or interpretation of this Agreement.

      14.14   *Gender.* Wherever any words are used herein in the masculine gender they shall be construed as though they were also used in the feminine and neuter gender in all cases where they would so apply, and wherever any words are used herein in the singular form they shall be construed as though they were also used in the plural form in all cases where they would so apply.

      14.15   *Integration.* This Agreement and any other agreement contemplated hereby supersede all prior negotiations, agreements, and understandings between the parties with respect to the subject matter hereof and thereof, constitute the entire agreement between the parties with respect to the subject matter hereof and thereof.

      14.16   *Deadline Dates; Business Day.* If any deadline date herein falls on a date that is not a Business Day, such date shall automatically be extended until the next Business Day. For all purposes **under this Agreement, the term "Business Day" or "Business Days" shall mean any day other than a** Saturday, Sunday, or national holiday on which National Banks in the county in which the Property is located are not open for business.

14.17   *Electronic Signatures.*   Handwritten signatures to this Agreement transmitted by telecopy or electronic transmission (for example, through the use of a Portable Document Format or "PDF" file) shall be valid and effective to bind the parties so signing.  It is expressly agreed that each party to this Agreement shall be bound by its own telecopied or electronically transmitted handwritten signature and shall accept the telecopy or electronically transmitted handwritten signature of the other party to this Agreement.  The parties hereto agree that the use of telecopied or electronic signatures for the execution of this Agreement shall be legal and binding and shall have the same full force and effect as if originally signed.

14.18   *Counterparts.*   This Agreement may be executed in several counterparts, and all such executed counterparts shall constitute the same agreement.  It shall be necessary to account for only one such counterpart in proving this Agreement

14.19   *Effective Date.*   For purposes of this Agreement, the term "Effective Date" shall be the last date on which this Agreement has been fully executed on behalf of Seller and Purchaser as indicated by the dates adjacent to the signatures of the parties set forth below.

**IN WITNESS WHEREOF**, the parties hereto have set their hands and seals the day and year above written.

**SELLER:**                                                        **SELLER:**

**Brown Corporation**                                   **Brown Industries, Inc.**

By:_____    By:_____
Lynn B. Whitworth, President                        J. Darren Wilcox, President

{Corporate Seal}                                           {Corporate Seal}

Date of Execution: ___9/27/21___, 2021.    Date of Execution: ___9/27/21___, 2021.


**PURCHASER:**

**Cohutta Property Investments, LLC**

By:_____
William Bryan Peeples, Manager


{Corporate Seal}


Date of Execution ___September 27___, 2021.

Escrow Agent joins in the execution hereof solely for the purpose of evidencing its agreement to hold the Earnest Money pursuant to the terms of the foregoing Agreement.

**ESCROW AGENT:**

**The Miner Firm**

By:_____(Seal)
      Member

Date of Execution: _September 27_, 2021.

# EXHIBIT "A"

Tract No. 1:

All that tract or parcel of land lying and being in Land Lot No. 314 in the 12th District and 3rd Section of Whitfield County, Georgia, and described as follows:

BEGINNING at a point on the west right of way line of the Georgia Power Company easement, said point of beginning being located south 07 degrees 57 minutes west 552.3 feet from the intersection of the west right of way line of the Georgia Power Company easement and the southerly right of way line of Industrial Boulevard, said point of beginning being the southeast corner of the property conveyed by Carl L. Griggs, Sr. to Arnold L, Caylor and John T. Minor, III, as Trustees of the Carl L. Griggs, Sr. Trust, by deed of record in Deed Book 212 Page 287, Whitfield County, Georgia Land Records; thence south 07 degrees 57 minutes west, along the west right of way line of the Georgia Power Company easement, 450.2 feet; thence north 76 degrees 05 minutes west 217.5 feet; thence north 00 degrees 40 minutes east 396.6 feet to the southwest corner of the property conveyed by Carl L. Griggs, Sr. to Arnold L. Caylor and John T. Minor, III, as Trustees of the Carl L. Griggs, Sr. Trust, by the aforesaid deed; thence eastwardly, along the south line of said property conveyed by Carl L. Griggs, Sr. to Arnold L. Caylor and John T. Minor, III, as trustees of the Carl L. Griggs, Sr. Trust, and partly along a joint wall between the buildings now or formerly occupied by Southern Binders, Inc. and the Taylor-Maker, Inc., 262.7 feet to the POINT OF BEGINNING.

The foregoing property is that property conveyed by Warranty Deed dated August 17, 1970 by Louis Realty, Inc. and Lloyd Realty, Inc. to National Service Industries, Inc. and recorded on August 17, 1970 in Deed Book 260 Pages 523-524, Whitfield County, Georgia Land Records.

The foregoing parcel is subject to the rights conveyed under that certain Quit Claim Deed dated August 17, 1970 by Arnold L. Caylor and John T. Minor, III, as Trustees of the Carl L. Griggs, Sr. Trust to National Service Industries, Inc. and recorded Deed Book 260 Pages 529-530, Whitfield County, Georgia Land Records.

Tract No. 2:

All that tract or parcel of land lying and being in Land Lot No. 314 in the 12th District and 3rd Section of Whitfield County, Georgia, and described as follows:

BEGINNING at a point on the west right of way line of the Georgia Power Company easement, said point of beginning being located south 07 degrees 57 minutes west 552.3 feet from the intersection of the west right of way line of the Georgia Power Company easement and the southerly right of way line of Industrial Boulevard, said point of beginning being the southeast corner of the property conveyed by Carl L. Griggs, Sr. to Arnold L. Caylor and John T. Minor, III, as Trustees of the Carl L. Griggs, Sr. Trust, by deed of record in Deed Book 212 Page 287, Whitfield County, Georgia Land Records; thence south 07 degrees 57 minutes west, along the west right of way line of the Georgia Power Company easement 450.2 feet; thence north 76 degrees 05 minutes west 217.5 feet; thence north 00 degrees 40 minutes east 396.6 feet to the southwest corner of the property conveyed by Carl L. Griggs, Sr. to Arnold L. Caylor and John T. Minor, III, as Trustees of the Carl L. Griggs, Sr. Trust, by the aforesaid deed; thence eastwardly, along the south line of said property conveyed by Carl L. Griggs, Sr. to Arnold L. Caylor and John T. Minor, III, as Trustees of the Carl L. Griggs, Sr. Trust, and partly along a joint wall between the buildings now or formerly occupied by Southern Binders, Inc. and the Taylor-Maker, Inc., 262.7 feet to the POINT OF BEGINNING.

TOGETHER WITH AN EASEMENT for the purpose of ingress and egress to the above described property, said easement being described as follows:

All that tract or parcel of land lying and being in Land Lot No. 314 in the 12th District and 3rd Section of Whitfield County, Georgia, and described as follows: BEGINNING at a point which is located south 65 degrees 29 minutes west 334.4 feet from a point which is located at an iron pin with said iron pin being located on the south side of Industrial Boulevard 991.2 feet south and 1,004.3 feet east from the northwest corner of said Land Lot No. 314; thence running north 65 degrees 29 minutes east 40 feet to the west line of the easement of Georgia Power Company; thence running south 07 degrees 57 minutes west, along the west right of way line of the Georgia Power Company easement, and along the east line of the property conveyed by Carl L. Griggs, Sr. to Arnold L. Caylor and John T. Minor, III as Trustees of the Carl L. Griggs, Sr. Trust, by deed of record in Deed Book 212 Page 287, Whitfield County, Georgia Land Records, 552.3 feet to the northeast corner of the property hereinabove conveyed; thence westwardly, along the north line of said property hereinabove conveyed, 40 feet; thence northwardly to the POINT OF BEGINNING.

The foregoing property is that· property conveyed by Quitclaim Deed dated August 17, 1970 by Carl L. Griggs, Sr. to National Service Industries, Inc. and recorded on August 17, 1970 at Deed Book 260 Pages 527-528, Whitfield County, Georgia Land Records.

Tract No. 3:

All that tract or parcel of land lying and being in Land Lot No. 314 in the 12th District and 3rd Section of Whitfield County, Georgia, and described as follows:

BEGINNING at a point on the southerly side of Industrial Boulevard which is located south 1,095.2 feet and east 776.8 feet from the northwest corner of said Land Lot No. 314; thence north 65 degrees 29 minutes east, along the southerly side of Industrial Boulevard, 217 feet; thence south 00 degrees 40 minutes west 146.3 feet; thence eastwardly, parallel with the south wall of the existing building now or formerly occupied by the Taylor-Maker, Inc., 30 feet; thence south 00 degrees 40 minutes west 228.5 feet; thence westwardly 255 feet; thence north 05 degrees 51 minutes east 288.5 feet to the POINT OF BEGINNING.

The foregoing property is that property conveyed by Warranty Deed dated August 17, 1970 by Lloyd Realty, Inc. to National Service Industries, Inc. and recorded on August 17, 1970 in Deed Book 260 Page 525, Whitfield County, Georgia Land Records.

Tract No. 4:

All that tract or parcel of land lying and being in Land Lot No. 314 in the 12th District and 3rd Section of Whitfield County, Georgia, and described as follows:

BEGINNING at a point located south 05 degrees 51 minutes west 288.5 feet from the point on the southerly side of Industrial Boulevard which is located south 1,095.2 feet and east 776.8 feet from the northwest corner of said Land Lot No. 314; thence eastwardly 255 feet: thence south 00 degrees 40 minutes west 396.6 feet; thence north 75 degrees 19 minutes west 174.2 feet; thence north 59 degrees 49 minutes west 125.8 feet; thence north 05 degrees 51 minutes east 288.5 feet to the POINT OF BEGINNING.

Being all of the property conveyed by Whitfield Industrial Park, Inc. to Carl L. Griggs, Sr., by deed of record in Deed Book 194 Page 468, Whitfield County, Georgia Land Records, except that portion thereof conveyed by Carl L, Griggs, Sr. to Lloyd Realty, Inc, in deed of record in Deed Book 245 Page 227, Whitfield County, Georgia Land Records.

The foregoing property is that property conveyed by warranty Deed dated August 17, 1970 by Carl L. Griggs, Sr. to National Service Industries, Inc. and recorded on August 17, 1970 in Deed Book 260 Page 526, Whitfield County, Georgia Land Records.

Tract No. 5:

A certain tract or parcel of land lying and being in Land Lot No. 314 of the 12th District and 3rd Section of Whitfield County, Georgia, which is more particularly described as follows:

TO FIND THE TRUE POINT OF BEGINNING of the tract of land herein conveyed, commence at the southeast corner of the intersection of Industrial Boulevard and South Hamilton Street, and run thence south 16 degrees 01 minutes west, along the west side of the right of way of South Hamilton Street, a distance of 1,101.4 feet, and run thence north 82 degrees 50 minutes west a distance of 233.26 feet to the TRUE POINT OF BEGINNING of the tract of land herein conveyed; and from said TRUE POINT OF BEGINNING run thence south 07 degrees 57 minutes west a distance of 277.87 feet to a point; thence north 71 degrees 13 minutes west a distance of 172.05 feet; thence north 72 degrees 18 minutes west 168.88 feet; thence north 84 degrees 48 minutes west 96.04 feet, thence north 50 degrees 12 minutes west 88.75 feet; thence north 05 degrees 35 minutes east a distance of 100 feet; thence south 60 degrees 00 minutes east 125.8 feet; thence south 75 degrees 35 minutes east a distance of 174.2 feet; thence south 76 degrees 21 minutes east 217.5 feet; thence north 07 degrees 41 minutes east a distance of 162.98 feet; thence south 82 degrees 50 minutes east a distance of 5.44 feet to the TRUE POINT OF ·BEGINNING OF THE TRACT OF LAND HEREIN CONVEYED.

The foregoing property is that property conveyed by Deed dated September 27, 1973 by Dalton-Whitfield County Hospital Authority and Beau Properties to National Service Industries, Inc. and recorded on November 1, 1973 in Deed Book 335 Pages 467-470, Whitfield County, Georgia Land Records.

Tract No. 6:

All that tract or parcel of land lying and being in Land Lot No. 314 of the 12th District and 3rd Section of Whitfield County, Georgia, and described as follows:

BEGINNING at a point on the west right of way line of the Georgia Power Company easement, said point of beginning being located south 07 degrees 57 minutes west a distance of 552.3 feet from the intersection of the west right of way line of the Georgia Power Company easement and the southerly right of way line of Industrial Boulevard, said point of beginning being the southeast corner of the property conveyed by Carl L. Griggs, Sr. to Arnold L. Caylor and John T. Minor, III, as Trustees of the Carl L. Griggs, Sr. Trust, by deed of record in Deed Book 212 Page 287, Whitfield County, Georgia Land Records; thence south 07 degrees 57 minutes west, along the west right of way line of the Georgia Power Company easement, 450.2 feet; thence north 76 degrees 05 minutes west 217.5 feet; thence north 00 degrees 40 minutes east 396.6 feet to the southwest corner of the property conveyed by Carl L. Griggs, Sr. to Arnold L. Caylor and John T. Minor, III, as Trustees of the Carl L. Griggs, Sr. Trust, by the aforesaid deed; thence eastwardly, along the south line of said property conveyed by Carl L. Griggs, Sr. to Arnold L. Caylor and John T. Minor, III, as Trustees of the Carl L. Griggs, Sr. Trust, and partly along a joint wall between the buildings now or formerly occupied by Southern Binders, Inc. and the Taylor-Maker, Inc. 262.7 feet to the POINT OF BEGINNING.

TOGETHER WITH AN EASEMENT for the purpose of ingress and egress to the above-described property, said easement being described as follows: All that tract or parcel of land lying and being in Land Lot No. 314 in the 12th District and 3rd Section of Whitfield County, Georgia, and described as follows:

BEGINNING at a point which is located north 65 degrees 29 minutes east 334.4 feet from a point which is located at an iron pin, with said iron pin being located on the south side of Industrial Boulevard 991.2 feet south

and 1,004.3 feet east from the northwest corner of said Land Lot No. 314, said District and Section; thence running north 65 degrees 29 minutes east 40 feet to the west line of the easement of Georgia Power Company; thence running south 07 degrees 57 minutes west along the west right of way line of the Georgia Power Company easement, and along the east line of the property conveyed by Carl L. Griggs, Sr. to Arnold L. Caylor and John T. Minor, III, as Trustees of the Carl L. Griggs, Sr. Trust, by deed of record in Deed Book 212 Page 287, Whitfield County, Georgia Land Records, 552.3 feet to the northeast corner of the property hereinabove conveyed; thence westwardly, along the north line of said property hereinabove conveyed, 40 feet; thence northwardly to the POINT OF BEGINNING.

The foregoing property is that property conveyed by Quit Claim Deed of Correction dated September 27, 1973 by Carl L. Griggs, Sr. to National Service Industries, Inc. and recorded on November 1, 1973 in Deed Book 335 Pages 458-460, Whitfield County, Georgia Land Records.

Tract No. 7:

All that tract or parcel of land lying and being in Land Lot No. 314 of the 12th District and 3rd Section of Whitfield County, Georgia, and described as follows:

BEGINNING at a point which is located south 00 degrees 40 minutes West a distance of 232.4 feet from an iron pin placed which is located south 991.2 feet and east 1,004.3 feet from northwest corner of Land Lot No. 314 in the 12th District and 3rd Section Whitfield County, Georgia; thence running south 00 degrees 40 minutes west a distance of 156.1 feet; thence running south 89 degrees 09 minutes east a distance of approximately 25 feet to the west side of a brick wall of a building now or formerly owned by Carllel, Inc.; thence running northerly, along the west side of said brick wall, a distance of 156.1 feet; thence running north 89 degrees 02 minutes 15 seconds west a distance of approximately 25 feet to the POINT OF BEGINNING.

The foregoing property is that property conveyed by Warranty Deed dated January 20, 1984 by Carllel, Inc. to National Service Industries, Inc. on January 31, 1984, and recorded in Deed Book 783 Pages 274-275, Whitfield County, Georgia Land Records.

Tract No. 8:

A tract of land lying and being in Land Lot Nos. 313 and 314 of the 12th District and 3rd Section of Whitfield County, Georgia, more particularly described as per plat by N.B. DeLoach, Georgia Registered Land Surveyor No. 1347, dated July 25, 1989 and revised August 18, 1989, as follows:

TO FIND THE POINT OF BEGINNING, begin at the southeast corner of said Land Lot No. 313, go thence north 07 degrees 01 minutes 26 seconds west 1,196.68 feet to a point on the southern right of way of Industrial Boulevard, said point being the POINT OF BEGINNING; go thence along an arc on said right of way (having a radius of 1,277.68 feet) in a northeasterly direction a distance of 79.41 feet to a point; thence continue along said right of way north 67 degrees 13 minutes 20 seconds east 734.96 feet to an iron pin; thence south 05 degrees 51 minutes 00 seconds west 577.00 feet to a point; thence north 65 degrees 29 minutes east 233.85 feet to a point; thence south 05 degrees 00 minutes 51 seconds west 100 feet to a point on the centerline of a creek; thence continuing along the centerline of said creek north 78 degrees 17 minutes west 54.40 feet; thence north 81 degrees 38 minutes west 21.87 feet; thence south 43 degrees 10 minutes west 21.19 feet; thence south 00 degrees 08 minutes 37 seconds east 192.26 feet; thence south 06 degrees 22 minutes west 92.27 feet; thence south 68 degrees 39 minutes west 34.38 feet, thence north 71 degrees 21 minutes west 31.14 feet; thence north 60 degrees 24 minutes west 77.85 feet; thence continuing to follow the centerline of said creek north 32 degrees 06 minutes 15 seconds west 150.23 feet, thence north 54 degrees 14 minutes 21 seconds west 64.05 feet; thence north 61 degrees 34 minutes 24 seconds west 182.12 feet; thence north 31 degrees 07 minutes 04 seconds west 73.34 feet; thence north 42 degrees 10 minutes 06 seconds west 100.55 feet; thence north 63 degrees 11 minutes

07 seconds west 58.48 feet; thence north 65 degrees 38 minutes 08 seconds west 93.77 feet; thence north 47 degrees 58 minutes 26 seconds west 66.22 feet; thence north 70 degrees 45 minutes 52 seconds west 44.47 feet; thence north 87 degrees 49 minutes 37 seconds west 40.91 feet to the POINT OF BEGINNING.

The foregoing property is that property conveyed by Special (Limited) Warranty Deed dated September 13, 1989 by World Carpets, Inc. to National Service Industries, Inc. and recorded in Deed Book 2087 Pages 290-292, Whitfield County, Georgia Land Records.

Tract No. 9:

All that tract of land lying in Land Lot No. 314 in the 12th District and 3rd Section, Whitfield County, Georgia and being more particularly described as follows:

BEGINNING at the northwest corner of Land Lot No. 314; thence due east 1,004.3 feet; thence due south, 991.2 feet to a point on the south right of way (80' R/W) of Industrial Boulevard and the POINT OF BEGINNING of the tract to be herein described; thence along the southern right of way of Industrial Boulevard, **north 65 degrees 29 minutes east 374.40 ft. to a point on the west right of way (100' R/W) of a Georgia Power** Company transmission line, thence along the west right of way of Georgia Power Company, south 07 degrees 57 minutes west 552.30 feet to a nail; thence north 89 degrees 09 minutes west, being partially along the north wall of a building, 240.50 feet to the southwest corner of a building; thence along the west side of a joint building wall north 00 degrees 51 minutes east, 156.1 feet; thence along the north side of a joint building wall, north 89 degrees 09 minutes west, 25.0 feet; thence leaving said wall, north 00 degrees 51 minutes east, 73.41 feet to a nail; thence north 89 degrees 02 minutes 15 seconds west, 30.30 feet to a nail; thence north 00 degrees 33 minutes east 145.50 feet to a nail on the south right of way of Industrial Boulevard; thence along the right of way of Industrial Boulevard, north 65 degrees 29 minutes east, 29.46 ft. to the POINT OF BEGINNING.

The aforesaid property is that property conveyed by Warranty Deed dated September 30, 1991 by Ropar, Ltd. To National Service Industries, Inc. and record in Deed Book 2245 Page 61-61, Whitfield County, Georgia Land Records.

The foregoing property is that identical property conveyed to National Service Industries, Inc. by World Carpets, Inc., in Warranty Deed dated December 13, 1984, and of record in Deed Book 838 Page 136, Whitfield County, Georgia Land Records.

Tract No. 10:

A tract of land lying and being in Land Lot No. 314 of the 12th District and 3rd Section of Whitfield County, Georgia, more particularly described as follows:

TO FIND THE TRUE POINT OF BEGINNING, begin at the northwest corner of said Land Lot No. 314; go thence south a distance of 1,095.2 feet to a point; thence east a distance of 776.8 feet to a point on the south right of way of Industrial Boulevard, which is the POINT OF BEGINNING; thence along the west boundary line of property now or formerly occupied by Brown Printing Company, south 05 degrees 51 minutes west a distance of 577.0 feet to a point; thence south 65 degrees 29 minutes west a distance of 233.85 feet to an iron pin; thence north 05 degrees 51 minutes east a distance of 577.0 feet to a point on the south right of way of Industrial Boulevard; thence along said right of way north 65 degrees 29 minutes east a distance of 233.85 feet to THE POINT OF BEGINNING.

Tract Nos. 1- 9 are the identical tracts as conveyed by Tract Nos. 6, 7, 8, 9, 10, 11, 12, 16 and 17 of that certain Limited Warranty Deed dated August 31, 1994 from National Service Industries, Inc. to MS Divestiture Corporation recorded in Deed Book 2543 Page 114, Whitfield County, Georgia Land Records; and Tract No.

10 is the identical tract as conveyed in that certain Corrective Quit Claim Deed from National Service Industries, Inc. to Brown Industries, Inc., as successor by name change to MS Divestiture Corporation recorded in Deed Book 5404 Page 273, Whitfield County, Georgia Land Records.

SUBJECT TO AND TOGETHER WITH the easements conveyed in that certain Joint Driveway Easement and Maintenance Agreement between Brown Corporation and Brown Industries, Inc. dated May 14, 2020, and recorded in Deed Book 6769 Page 899, Whitfield County, Georgia Land Records.

LESS AND EXCEPT that certain tract or parcel of land lying and being in Land Lot Nos. 313 and 314 in the 12th District and 3rd Section of Whitfield County, Georgia, and being more particularly described as per plat of survey prepared by Christopher L. Lewis, Georgia Registered Land Surveyor No. 1347, dated November 4, 2016, and being more particularly described according to said survey as follows:

BEGINNING at an iron pin located in the southeast right of way line of **Industrial Boulevard (80' R/W), said** point being located in a south 64 degrees 41 minutes 52 second west from the centerline intersection of the centerline of Industrial Boulevard and South Hamilton Street; thence south 05 degrees 19 minutes 46 seconds west a distance of 675.67 feet to an iron pin located in the centerline of a creek; thence running in a northwesterly direction, along the centerline of a creek, and following the meanderings thereof the following courses and distances, to wit:  north 78 degrees 44 minutes 27 west, 54.40 feet; north 82 degrees 05 minutes 27 west, 21.87 feet; south 42 degrees 42 minutes 33 west, 21.19 feet; south 05 degrees 54 minutes 33 west, 92.27 feet; south 68 degrees 11 minutes 33 west, 34.38 feet; south 71 degrees 48 minutes 27 west, 31.14 feet; north 60 degrees 51 minutes 27 west, 77.85 feet; north 54 degrees 41 minutes 48 west, 64.04 feet; north 31 degrees 34 minutes 31 west, 73.34 feet; north 42 degrees 37 minutes 33 west, 100.55 feet; north 63 degrees 38 minutes 34 west, 58.48 feet;  north 66 degrees 05 minutes 35 west, 93.77 feet; north 48 degrees 25 minutes 53 west, 66.22 feet; north 71 degrees 13 minutes 19 west, 44.47 feet; and north 87 degrees 58 minutes 15 west, 41.81 feet; thence running in a northeasterly direction, along the southwest right of way line of Industrial Boulevard, **along a curve to the left (1,277.68' Radius) an arc distance of 78.18 feet, said curve being subtended by a chord** with a bearing of north 69 degrees 31 minutes 14 seconds east and a distance of 78.17 feet; thence running 66 degrees 45 minutes 53 seconds east, along the southwest right of way line of Industrial Boulevard, a distance of 734.96 feet; thence north 65 degrees 23 minutes 35 seconds ease, along the southwest right of way line of Industrial Boulevard, a distance of 233.81 feet to the POINT OF BEGINNING.

TOGETHER WITH the Waterline Easement.

## EXHIBIT "B"



# EXHIBIT "C"

{copy of the Lease}

## LEASE AGREEMENT

This Lease Agreement ("Lease") is made and entered into this 21st day of December 2020, by and between **Brown Industries, Inc.**, a Georgia corporation ("Tenant"), and **Brown Corporation**, a Georgia Corporation ("Landlord").

1.      Premises.  Landlord does hereby lease to Tenant, and Tenant does hereby lease from Landlord the real property, building and improvements at the premises located at 203 W. Industrial Blvd, Dalton, Georgia, generally described as the "front portion of the Southern Binders building" and consisting of approximately 63,900 square feet, together with all necessary parking, loading areas and appurtenant easements and rights thereto, **plus** that certain tract of land containing three (3) acres, more or less, adjacent to the west boundary of the Brown Printing Property, including all improvements pertaining to the property (all of which together shall be known as the "Premises").  Specifically excluded are the offices and storage space of approximately 1,200 square feet currently occupied by the Landlord in the northern portion of the building for use as its office space and file storage, plus two parking spaces directly in front of the outside entrance to those offices and storage space.

2.      Term.  The term of this Lease shall be for **one (1) year**, commencing on January 1, 2021 ("Commencement Date") and terminating on December 31, 2021 ("Termination Date") (together, the "Term").

3.      Option to Renew.  There are no specific provisions for renewing the lease upon its termination on December 31, 2021.  Tenant and Landlord may negotiate a new lease in advance of the Termination Date, to commence immediately following the termination of this lease, updating terms and rental amounts as agreeable between the parties.

4.      Rent.  Tenant shall pay rent in the amount of One Hundred Forty-Two Thousand Eight Hundred and No/100 Dollars ($142,800.00) per year, payable monthly in amounts of Eleven Thousand Nine Hundred and No/100 Dollars (**$11,900.00**) per month ("Rent").  Rent shall commence on the Commencement Date and be payable in advance on the first day of each month to Landlord at the address set forth in Section 22(e), or by electronic ACH transfer directly to Landlord's bank account (as provided to Tenant by Landlord).  Rent for any partial month shall be prorated.

5.      Property Taxes.  Landlord shall pay directly to the taxing authority before the time when due, all real property taxes, payments in lieu of real property taxes, and real property assessments against the Premises (collectively, referred to as "Taxes") during the Term.

6.      Insurance.
  a.      *Tenant's Insurance Requirements.*  Tenant agrees and covenants while this Lease is in effect, it shall maintain comprehensive general public liability insurance against claims for personal injury, death or property damage occurring upon, in or about the Premises, naming Landlord as an additional insured, with such insurance affording protection to the limit of not less than $1,000,000.00 per occurrence and $2,000,000.00 in the aggregate for bodily injury and property damage liability.  Tenant shall be responsible, at its expense, for maintaining insurance on all of its personal property located within the Premises.  Tenant has no obligation to name Landlord as an additional insured on policies covering Tenant's personal property, machinery and equipment, and in no event shall Landlord be entitled to any insurance proceeds payable for loss or damage related to Tenant's personal property, machinery and equipment, including any trade fixtures of Tenant.
  b.      *Landlord's Insurance Requirements.*  Landlord agrees and covenants while this Lease is in effect, that it shall keep all improvements, including the Premises, insured to one hundred percent

1

days of the fire or other casualty, then Tenant may terminate this Lease.

17.    Condemnation/Eminent Domain.  If any part of the Premises shall be taken or condemned for a public or quasi-public use (or any transfer is made in lieu thereof) and a part thereof remains which is suitable by the Tenant for the use contemplated hereunder, this Lease shall, as to the part so taken, terminate as of the date title shall be taken by the condemnor and the Rent payable hereunder shall be so adjusted so that Tenant shall be required to pay for the remainder of the term only such portion of such Rent after the condemnation as the condemnation bears to the whole of the Premises at the time of condemnation.  If all the Premises to be taken or condemned or so much thereof that the use by the Tenant shall be substantially impaired (and in this regard the parties acknowledge the parking and loading area(s) and direct access from the Premises to any adjacent public streets or highway to be of great importance to the business of the Tenant), Tenant may then cancel and terminate this Lease.  In any such proceeding whereby all or a part of the Premises are taken, whether or not Tenant elects to terminate the Lease, the parties hereto shall be free to make claim against the condemning party for the amounts of the actual provable loss done to each of them by such proceeding and neither of the parties hereto shall share in the other party's award.  Neither party shall have any rights in or to any award made to the other by the condemning authority.

18.    Breach or Default.  If at any time during the term of the Lease any payment of Rent or other amounts due under this Lease shall be past due or unpaid for a period of ten (10) days following receipt by Tenant of written notice thereof from Landlord, or if any of the non-monetary terms or conditions of this Lease be violated and not cured within thirty (30) days following the receipt by Tenant of written notice thereto from Landlord, this Lease shall, at the option of Landlord, terminate and Landlord may thereupon lawfully enter into or upon the Premises or any part thereof, repossess the same and expel Tenant therefrom, without prejudice to any other claims or remedies Landlord may have for the collection of Rent and/or for damages for breach of this Lease.  If Landlord breaches any obligation under this Lease and such breach is not cured within thirty (30) days of written notice, Tenant shall have the right to terminate this Lease, effective as of the date of such notice.

19.    Signs.  Tenant shall have the right, at its cost and expense, throughout the Term of this Lease, to install and maintain, in accordance with all applicable laws, signs at such places upon the Premises as Landlord may reasonably approve.  Upon the expiration of this Lease, Tenant shall remove any such signs and shall repair any damage caused by the removal thereof.

20.    Indemnity.  Tenant agrees to indemnify and hold Landlord harmless against any and all expenses, loss or liability paid, including reasonable attorneys' fees and costs, suffered or incurred by Landlord as a result of any breach by Tenant of any covenants or conditions of this Lease or the negligence of Tenant, its agents or employees.  Landlord agrees to indemnify and hold Tenant harmless against any and all expenses, losses or liabilities paid, including reasonable attorneys' fees and costs, suffered or incurred by Tenant as a result of any breach by Landlord of any covenants or conditions of this Lease or the negligence of Landlord, its agents or employees.

21.    Environmental Representations and Warranties.  Landlord represents and warrants that the Premises contain no Hazardous Materials (as defined below) and there has been no Release (as defined below) of Hazardous Materials on the Premises or into the soil or groundwater under the Premises.  Except for Hazardous Materials contained in products used by Tenant in de minimis quantities for ordinary cleaning and office purposes, Tenant represents and warrants that Tenant shall not bring any Hazardous Materials onto the Premises or Release any Hazardous Material on the Premises or into the soil or groundwater under the Premises.  "Environmental Laws" means all applicable federal, state and local laws, regulations and ordinances relating to public health and safety and protection of the environment. "Hazardous Materials" includes any toxic substances, hazardous wastes, hazardous substances, or any other

4

pollutants or dangerous substances regulated pursuant to any and all Environmental Laws (as defined below), and shall include, without limitation, asbestos, urea formaldehyde, polychlorinated biphenyls (PCBs), oil, petroleum products and fractions, underground storage tanks, whether empty, filled or partially filled with any substance (regulated or otherwise), any substance or material the presence of which on the Property is prohibited by any Environmental Laws and any other substance or material which requires special handling or notification of any federal, state or local governmental entity regarding collection, storage, treatment or disposal. "Environmental Laws" means all applicable federal, state and local laws, regulations and ordinances relating to public health and safety and protection of the environment. "Release" means spilling, leaking, pumping, pouring, emitting, emptying, discharging, injecting, escaping, leaching, disposing or dumping.

    22.   <u>General Provisions</u>.

       a.  *Assignment*. Tenant may not assign, delegate, or transfer the Lease or any of its rights or duties hereunder, without the prior written consent of Landlord which shall not be unreasonably withheld, conditioned or delayed; provided, however, upon providing Landlord written notice of such assignment, Tenant may assign this Lease to any affiliate that is under common control with Tenant or to any party that acquires substantially all of Tenant's business assets used on the Premises. The provisions of this Lease shall be binding upon and inure to the benefit of the parties, their successors and permitted assigns.

       b.  *Memorandum of Lease*. The parties agree that this Lease shall not be filed of record; however, at the request of either party, Landlord and Tenant shall execute a Memorandum of Lease to be recorded for the purposes of giving record notice of the appropriate provisions of this Lease.

       c.  *Governing Law*. This Lease shall be governed by the laws of the state in which the Premises is situated (other than its conflicts of law principles).

       d.  *Modification and Waiver*. No modification to this Lease, nor any waiver of any rights, will be effective unless assented to in writing by the party to be charged, and the waiver of any breach or default shall not constitute a waiver of any other right hereunder or any subsequent breach or default.

       e.  *Notices*. Any required or permitted notices hereunder must be given in writing at the address of each party set forth below, or to such other address as either party may substitute by written notice to the other in the manner contemplated herein, by one of the following methods: hand delivery; registered, express, or certified mail, return receipt requested, postage prepaid; or nationally-recognized private express courier. Notices will be deemed given on the date received.

| *If to Tenant*: | *If to Landlord:* |
|---|---|
| Brown Industries, Inc. | Brown Corporation |
| 205 W. Industrial Blvd | P. O. Box 1103 |
| Dalton, GA 30722-1103 | Dalton, GA 30722-1103 |

       f.  *Severability*. If for any reason any provision of this Lease shall be held by a court of competent jurisdiction to be invalid or unenforceable, the remaining provisions of this Lease shall remain in full force and effect.

       g.  *Entire Agreement*. This Lease and the exhibits attached hereto constitute the entire and exclusive agreement between the parties hereto with respect to the subject matter hereof and supersede any prior agreements between the parties with respect to such subject matter.

       h.  *Construction.* Whenever the singular number is used in this Lease and when required by the context, the same shall include the plural and vice versa, and the masculine gender shall include the feminine and neuter genders and vice versa.

       i.  *Headings*. The headings in this Lease are inserted only as a matter of convenience and for reference and in no way define, affect, limit, or describe the scope or intent of this Lease.

       j.  *Counterparts*. This Lease may be executed in counterparts, each of which shall be deemed an original but all of which shall constitute one and the same instrument.

k.   *Time of Essence*.  Time is of the essence in this Lease.

*Signature page follows.*

*Signature Page to Lease Agreement*

IN WITNESS WHEREOF, the parties have caused this Lease to be executed by their respective authorized representatives as of the date first set forth above.

**LANDLORD:**                                      **TENANT:**

**Brown Corporation**                          **Brown Industries, Inc.**

By: _Lynn B Whitworth_              By: _____

Name: _Lynn B Whitworth_          Name: _Robert K Shepperd, Jr_

Its: _President_                             Its: _CFO_

6

## **EXHIBIT 2**

**First Amendment to Commercial Purchase and Sale Agreement**

# FIRST AMENDMENT TO COMMERCIAL
# PURCHASE AND SALE AGREEMENT

**This First Amendment to Purchase and Sale Agreement** (this "Amendment") is made and entered into this 22nd day of October, 2021, and among **Brown Corporation** ("Brown Corp."), a Georgia corporation and **Brown Industries, Inc.** ("Brown Industries"), a Georgia corporation (Brown Corp. and Brown Industries are hereinafter collectively called "Seller") and **Cohutta Property Investments, LLC,** a Georgia limited liability company (hereinafter called "Purchaser").

## W I T N E S S E T H :

**WHEREAS**, the parties entered into that certain Agreement for Sale and Purchase of Real Property (the "Contract"), pursuant to which Seller has agreed to sell and Purchaser has agreed to purchase certain real estate as described therein (the "Property"); and

**WHEREAS**, the parties have agreed to amend the Contract, to reflect certain other agreements between the parties;

**NOW THEREFORE**, for and in consideration in the sum of ten dollars ($10.00) and hand paid, the premises contained herein, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged the parties hereby agree as follows:

1.      The parties hereto acknowledge that the above recitals to this Amendment are true and correct, and agree that the same are incorporated by reference into the body of this Amendment.

2.      The parties do hereby agree to delete Section 1.3 of the Contract in its entirety and in its place substitute the following:

"1.3     Certain personal property owned by Seller upon the Land or within the Improvements, including specifically, the heating, ventilation and air conditioning systems and equipment, electrical panels, and sprinkler systems (the "Personal Property");"

3.      The parties do hereby agree to delete Section 2.3 of the Contract in its entirety and in its place substitute the following:

"2.3     *Price Allocation.* The parties agree that the purchase price shall be allocated as follows: (A) 1,538,678.00 to Brown Corp.; and (B) $3,461,322.00 to Brown Industries."

4.      The parties do hereby agree to delete Section 9.1(A) of the Contract in its entirety and in its place substitute the following:

"9.1 (A)        Upon the approval of the Bankruptcy Court as described in Section 7 of this Agreement, Seller will have the right, power and authority to enter into this Agreement and the right, power, and authority to convey the Property in accordance with the terms and conditions of this Agreement, and this Agreement will constitute the valid and binding agreement of Seller and is enforceable in accordance with its terms."

5.      The parties do hereby agree to delete Section 9.1(D) of the Contract in its entirety and in its place substitute the following:

"9.1 (D)        Brown Corp. is the sole owner in fee simple of the portion of the Property vested of record in the name of Brown Corporation, and Brown Industries is the sole owner in fee simple of the portion of the Property vested of record in the name of Brown Industries, Inc."

6.        The parties do hereby agree to delete Section 9.1(F) of the Contract in its entirety and in its place substitute the following:

"9.1 (F)        No consent of any Federal, State or local authority, except for the approval of the Bankruptcy Court as described in Section 7 of this Agreement, is required to be obtained by Seller in connection with the consummation by Seller of the transactions contemplated hereby."

7.        The parties do hereby agree to delete Section 9.1(I) of the Contract in its entirety and in its place substitute the following:

"9.1 (I) Except for the Chapter 11 Bankruptcy Court proceeding filed by Brown Industries, Inc., as described in Section 7 of this Agreement, there is no litigation or proceeding pending, or to Seller's knowledge threatened, against or relating to or affecting all or any part of the Property, nor does Seller know or have reasonable grounds to know of any basis for any such action."

8.        The parties do hereby agree to delete Section 10 of the Contract in its entirety and in its place substitute the following:

"10.        **Brokers.**  The parties each represent and warrant to the other that there are no real estate brokers, salesman or finders involved in this transaction other than Industry Real Estate Partners (the "Authorized Broker").  Brown Corp. hereby agrees that it shall pay a brokerage commission (the "Commission") to the Authorized Broker pursuant to a separate agreement between Brown Corp. and the Authorized Broker.  If a claim is made by anyone other than the Authorized Broker for brokerage fees or commissions in connection with this transaction by any broker, salesman or finder claiming to have dealt by, through or on behalf of one of the parties hereto (the "Indemnitor"), Indemnitor shall indemnify, defend and hold harmless the other party hereunder (the "Indemnitee"), and Indemnitee's officers, directors, agents and representatives, from and against any and all liabilities, damages, claims, costs, fees, and expenses whatsoever, including reasonable attorneys' fees and court costs through all trial and all appellate levels, with respect to said claim for brokerage. The parties acknowledge and agree that any brokerage charge or commission for the Authorized Broker shall be the exclusive responsibility of Brown Corp.."

9.        The parties do hereby agree to delete Section 13.1 of the Contract in its entirety and in its place substitute the following:

"13.1.  *Purchaser's Default.*  In the event of a Default by Purchaser under the terms of this Agreement, Seller's sole and exclusive remedies hereunder shall be to either terminate this Agreement and receive payment of the Earnest Money from Escrow Agent as full liquidated damages for such default of Purchaser, or to seek specific performance of Purchaser's obligations under this Agreement, without any adjustment in the Purchase Price, by commencing such an action within thirty (30) days after the date of Purchaser's default.  It is hereby agreed that Seller's damages in the event of a default by Purchaser hereunder are uncertain and difficult to ascertain, and that the Earnest Money constitutes a reasonable liquidation of such damages and is intended not as a penalty, but as full liquidated damages.  Purchaser covenants not to bring any action or suit challenging the amount of liquidated damages provided hereunder in the event of such default.

Notwithstanding anything to the contrary contained herein, this provision shall in no way affect or impair Seller's right of recovery under any indemnity given by Purchaser in favor of Seller under this Agreement."

10. The parties do hereby agree to delete Section 14.1 of the Contract in its entirety.

11. The parties do hereby agree to delete Section 14.4 of the Contract in its entirety and in its place substitute the following:

"14.4. *Controlling Law.* This Agreement shall be governed by and construed in accordance with the domestic laws of the State of Georgia without giving effect to the principles of conflicts of law thereof. Each of the Parties consents to the exclusive jurisdiction of the United States Bankruptcy Court for the Northern District of Georgia for any legal action, suit, or proceeding arising out of or in connection with this Agreement, and agree that any such action, suit, or proceeding may be brought only in such court. Each of the Parties further waives any personal jurisdiction defense regarding the laying of venue for any such suit, action, or proceeding in such court."

12. The parties do hereby agree to amend and modify the Contract to add the following to the end of the notice provisions contained in Section 14.11 of the Contract:

"J. Robert Williamson
Ashley R. Ray
Scroggins & Williamson, P.C.
4401 Northside Parkway, Suite 450
Atlanta, Georgia 30327
rwilliamson@swlawfirm.com
aray@swlawfirm.com"

13. The parties do hereby agree to amend and modify the Contract to add the following paragraph 15 to the Contract:

"15. **Temporary Occupancy Agreement.**

15.1 Brown Industries hereby agrees to pay Purchaser $11,900 per month for the privilege of remaining on a portion of the Property after the Closing pursuant to the provisions of this Section (the "Temporary Occupancy Agreement").

15.2 The portion of the Property upon which Brown Industries shall have the right to remain during this Temporary Occupancy Agreement is described as: (A) that portion of the Property shown in yellow on the diagram of the Property attached hereto as Exhibit "1" (the "Brown Industries Warehouse Leased Area"); (B) the offices labeled "IT Room" and "Brown Industries Office" located within that portion of the Property shown in blue on the diagram of the Property attached hereto as Exhibit "1" (the "Office Leased Area"); and (C) that portion of the Property shown in green on the diagram of the Property attached hereto as Exhibit "1" (the "Brown Corp. Warehouse Leased Area"). The Brown Industries Warehouse Leased Area, the Brown Corp. Warehouse Leased Area, and the Office Leased Area being referred to as the "Occupancy Premises."

15.3 In addition to the Occupancy Premises, Brown Industries may enter upon that portion of the Property that is not shaded on diagram of the Property attached hereto as the Exhibit "1" to

- 3 -

access the loading dock and door shown in orange on the diagram of the Property attached hereto as Exhibit "1" (the "Loading Dock") for purposes of removing Brown Industries' personal property from the Occupancy Premises during Purchaser's normal business hours, so long as such access is coordinated at least twenty-four (24) hours in advance with Purchaser and does not unreasonably interfere with Purchaser's business activities on the Property.

15.4    The term of the temporary occupancy (the "Temporary Occupancy") shall begin on the date of the Closing and shall end at the earlier of: (a) the removal of all personal property and equipment owned by Brown Industries from the Occupancy Premises, or (b) 120 days after the approval of that certain Asset Purchase Agreement by and between Brown Industries and PPL Acquisition Group XI, LLC and its assigns, The Branford Group, Northeast Printing Machinery, and Holland Industrial Group dated October 1, 2021 (the "PPL Agreement") or such other agreement between Brown Industries and a prevailing third-party bidder for the purchase of substantially similar assets to those identified in the PPL Agreement by the United States Bankruptcy Court for the Northern District of Georgia, in that certain Chapter 11 filing in Case No. 21-41010 (the "Occupancy Period"), unless sooner terminated by agreement of the parties.

15.5    Brown Industries shall vacate the Occupancy Premises no later than by the end of Occupancy Period. If Brown Industries vacates the Occupancy Premises sooner than by the end of the Occupancy Period, Brown Industries shall notify Purchaser of the same. At the time Brown Industries vacates the Occupancy Premises, Brown Industries shall turn over all keys to the Occupancy Premises in Brown Industries' possession to Purchaser.  Brown Industries agrees to maintain all utilities in Brown Industries' name and pay the bills for such utilities as they become due during the Occupancy Period. Brown Industries agrees that Brown Industries will not make any improvements or modifications to Occupancy Premises during the Occupancy Period.

15.6    Brown Industries hereby expressly releases Purchaser from any and all liability of any nature whatsoever which may arise as a result of Brown Industries' acts or the acts of anyone else entering the Occupancy Premises during the Occupancy Period, including, but not limited to, liability for injury to persons and/or damage to personal property resulting from or in any manner occasioned by such occupancy. Brown Industries further agrees to hold harmless and indemnify the Purchaser from any claim or loss arising out of or occasioned by Brown Industries' occupancy of the Occupancy Premises during the Occupancy Period.  It is specifically understood that should the Property be destroyed by fire or other occurrence during the Occupancy Period, Brown Industries shall bear the risk of loss to Brown Industries' personal property.  Brown Industries shall be liable for the expense of repairing any damage to the Property caused by Brown Industries or Brown Industries' licenses and invitees during the Occupancy Period.

15.7    If Brown Industries does not timely vacate Occupancy Premises by the end of the Occupancy Period, Brown Industries shall be deemed to be a tenant at sufferance, shall be unlawfully holding over, shall be subject to being evicted and shall pay Purchaser a per day rent during the period in which Brown Industries is holding over in the amount of $397 per day for each day after the end of the Occupancy Period that Brown Industries remains in the Occupancy Premises.

15.8    Brown Industries agrees to pay all costs of any legal action instituted by Purchaser to enforce the terms of this Section, including reasonable attorneys' fees.  Brown Industries acknowledges that this Temporary Occupancy Agreement is not intended to create a relationship of landlord and tenant between Brown Industries and Purchaser after the Closing.  Instead, this paragraph merely grants Brown Industries a right to occupy the Occupancy Premises after the Closing until the date specified herein.  This Section 15 shall survive the Closing.

15.9    Brown Industries, at its sole expense, shall comply with all laws, rules, orders and regulations of Federal, State, City and County authorities and with any direction of any public officer or officers, pursuant to law, which shall impose any duty upon Brown Industries or Purchaser with respect to or arising out of Purchaser's use or occupancy of the Occupancy Premises.

15.10   Brown Industries shall comply with all applicable Environmental Laws which is defined as all federal, state, and local laws, rules, regulations, codes, plans, injunctions, judgments, orders, decrees, rulings, and charges thereunder and other governmental requirements relating to pollution, control of chemicals, storage and handling of petroleum products, management of waste, discharges of materials into the environment, health, safety, natural resources, and the environment, including laws relating to emissions, discharges, releases, or threatened release of pollutants, contaminants or chemical, industrial, hazardous, or toxic materials or wastes into ambient air, surface water, ground water, on lands or otherwise relating to the manufacture, processing, distribution, use, treatment, storage, disposal, transport, or handling of pollutants, contaminants, or chemical, industrial, hazardous, or toxic materials or waste.

15.11   Brown Industries shall not do or permit to be done any act or thing upon the Occupancy Premises which will invalidate or be in conflict with any insurance policies covering the Occupancy Premises and the fixtures and property therein; and shall not do, or permit to be done, any act or thing upon the Occupancy Premises which shall subject Purchaser to any liability or responsibility for injury to any person or persons or to property by reason of any business or operation being carried on upon said Occupancy Premises or for any other reason.

15.12   Brown Industries shall give to Purchaser prompt written notice of any accident involving persons other than agents or employees of Purchaser, fire or damage occurring on or to the Occupancy Premises.

15.13   Brown Industries shall secure any and all permits for such use as Brown Industries intends to make of the Occupancy Premises prior to the effective date of this Agreement.

15.14   During the term of this Occupancy Agreement and for any further time that Brown Industries shall hold the Occupancy Premises, Brown Industries shall obtain and maintain at its sole expense insurance on all buildings, improvements and equipment on the Occupancy Premises, including all alterations, additions, and improvements, insured against loss or damage by fire. The insurance shall be in an amount sufficient to prevent Brown Industries and Purchaser from becoming co insurers under provisions of applicable policies of insurance, but in any event in an amount of not less than 100% of the appraised value thereof. During the term of the Occupancy Period and for any further time that Brown Industries shall hold the Occupancy Premises, Brown Industries shall obtain and maintain at its sole expense insurance against liability for bodily injury and property damage and machinery insurance, all to be in amounts and in forms of insurance policies as may from time to time be required by Purchaser. Absent any other determination by Purchaser, the minimum amount of such insurance shall be $5,000,000.00 for any one occurrence. All insurance provided by Brown Industries as required by this Section shall be carried in favor of Brown Industries and Purchaser as their respective interests may appear. All insurance shall be written with responsible companies, and Brown Industries shall provide appropriate certificates of insurance to Purchaser."

14.     The parties do hereby agree to amend and modify the Contract to add the following paragraph 16 to the Contract:

"16.   **<u>Termination of Lease</u>**.   The parties agree that that certain Lease Agreement between Brown Industries and Brown Corp. dated December 21, 2020 (the "Lease") shall be terminated as of the date of Closing, and Brown Industries and Brown Corp. shall have no further obligations pursuant to the Lease except for: (i) obligations accruing prior to the date of termination, including but not limited to, the obligation for payment of Rent incurred prior to the termination of the Lease and (ii) obligations, promises, or covenants contained in the Lease which are expressly made to extend beyond the term of the Lease."

15.    Except as herein specifically modified, all of the terms, conditions and provisions of the Contract shall remain in full force and effect.

16.    This Amendment shall be binding upon and shall inure to the benefit of the parties hereto and their respective heirs, successors and assigns.

17.    Time is of the essence of this Amendment and the parties hereby acknowledges that all time periods contained in the Contract shall be strictly construed.

18.    This Amendment shall be governed by and interpreted in Courts of Law in the State of Georgia.

19.    All capitalized terms not defined herein shall have the meanings ascribed to them in the Contract.

20.    Handwritten signatures to this Amendment transmitted by telecopy or electronic transmission (for example, through the use of a Portable Document Format or "PDF" file) shall be valid and effective to bind the parties so signing.  It is expressly agreed that each party to this Amendment shall be bound by its own telecopied or electronically transmitted handwritten signature and shall accept the telecopy or electronically transmitted handwritten signature of the other party to this Amendment.  The parties hereto agree that the use of telecopied or electronic signatures for the execution of this Amendment shall be legal and binding and shall have the same full force and effect as if originally signed.

21.    This Amendment may be executed in several counterparts, and all such executed counterparts shall constitute the same agreement.  It shall be necessary to account for only one such counterpart in proving this Amendment.

*Signatures are contained on the following page.*

**IN WITNESS WHEREOF**, the parties hereto have set their hands and seals the day and year above written.

**SELLER:**                                            **SELLER:**

**Brown Corporation**                                 **Brown Industries, Inc.**

By: _Lynn B. Whitworth_                               By: _____
    Lynn B. Whitworth, President                  J. Darren Wilcox, President

        {Corporate Seal}                              {Corporate Seal}

Date of Execution: __10/20__, 2021.                   Date of Execution: _____, 2021.

**PURCHASER:**

**Cohutta Property Investments, LLC**

By: _____
    William Bryan Peeples, Manager

        {Corporate Seal}

Date of Execution: _____, 2021.

**IN WITNESS WHEREOF**, the parties hereto have set their hands and seals the day and year above written.

**SELLER:**

**Brown Corporation**

By:_____
      Lynn B. Whitworth, President

           {Corporate Seal}

Date of Execution: _____, 2021.

**SELLER:**

**Brown Industries, Inc.**

By:_____
      J. Darren Wilcox, President

           {Corporate Seal}

Date of Execution: _____, 2021.

**PURCHASER:**

**Cohutta Property Investments, LLC**

By:_____
      William Bryan Peeples, Manager

           {Corporate Seal}

Date of Execution: _____, 2021.

- 7 -

**IN WITNESS WHEREOF**, the parties hereto have set their hands and seals the day and year above written.

SELLER:                                    SELLER:

**Brown Corporation**                       **Brown Industries, Inc.**

By:_____          By:_____
    Lynn B. Whitworth, President              J. Darren Wilcox, President

{Corporate Seal}                           {Corporate Seal}

Date of Execution: _____, 2021.     Date of Execution: _____, 2021.

PURCHASER:

**Cohutta Property Investments, LLC**

By:_____
    William Bryan Peeples, Manager

{Corporate Seal}

Date of Execution: *October 22nd*, 2021.

**EXHIBIT "1"**

THIS EQUIPMENT WILL HAVE TO BE LOADED AT REAR DOCK AREA.

AREAS WITH EQUIPMENT OWNED BY BROWN INDUSTRIES

HAZ. CHEM. STORAGE UNIT

DOCKS

278

111'

OFFICE

WAREHOUSE

SILK SCREEN

120

167'

WAREHOUSE

192'

25'

80'

SILK SCREEN

DIGITAL PRINTING/ S-40 ROOM

GARAGE

28

16

112'

86'

132'

FILM DEPARTMENT

MEZZANINE ABOVE

RESTROOM

PRESS AREA

OFFICES

RESTROOMS

180'

BREAK AREA

OFFSET PRESS AREA

244

PRODUCTION AREA

OFFICES

PRE-PRESS

INDIGO

INDIGO

MECHANICAL ROOM

55'

200'

OFFICE AREA

IT

OFFICE AREA

230

BROWN IND. EMPLOYEE OFFICES LOCATED ON BOTH FLOORS.

BROWN INDUSTRIES 2 - STORY OFFICE

IT DEPT. (BOTH FLOORS)

ASSEMBLY

VACUUM FORM (DEPT)

STORAGE

SHIPPING AREA

STORAGE

BREAKROOMS

245

45

192

BROWN CORPORATION SECTION (APPROX. 65,000 SF)

Brown Printing Bldg.

## <u>CERTIFICATE OF SERVICE</u>

This is to certify that on this date a true and correct copy of the within and foregoing **Debtor's Motion For (I) Authority To (A) Sell Certain Real Property Free And Clear Of Liens, Claims, And Encumbrances (B) Terminate Real Property Lease, And (C)  Enter Into Occupancy Agreement, And (II) Entry Of An Order (X) Limiting Notice, (Y) Setting Deadline For Competing Bids And Objections,  And (Z) Scheduling Hearing** was served by the Court's CM/ECF system on all counsel of record registered in this case through CM/ECF.

This 22nd day of October, 2021.

SCROGGINS & WILLIAMSON, P.C.

By:   /s/ Ashley R. Ray
     J. ROBERT WILLIAMSON
     Georgia Bar No. 765214
     ASHLEY REYNOLDS RAY
     Georgia Bar No. 601559

4401 Northside Parkway
Suite 450
Atlanta, GA 30327
T:     (404) 893-3880
F:     (404) 893-3886
E:     rwilliamson@swlawfirm.com
     aray@swlawfirm.com

*Counsel for Debtor*